## In the Matter of LUCE INDUSTRIES, INC., Debtor.

### Bankruptcy No. 80 B 10946.

United States Bankruptcy Court, S. D. New York.

Dec. 24, 1980.

---

Finkel, Goldstein & Berzow, New York City, for debtor; Harold Berzow, New York City, of counsel.

Whitman & Ransom, New York City, for Fruit of the Loom, Inc.; William M. Kahn, and Joseph Goldblum, New York City, of counsel.

BURTON R. LIFLAND, Bankruptcy Judge.

### MEMORANDUM OPINION

OSC to Terminate License

[Issues Limited to § 365(b)(1)]

*Section 365 (11 U.S.C. § 365)*

*Executory Contracts and Unexpired Leases*

\*    \*    \*    \*    \*    \*

*(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee —*

*(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;*

*(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and*

*(C) provides adequate assurance of future performance under such contract or lease.*

\*    \*    \*    \*    \*    \*

The Court is called upon to interpret the prerequisites for the assumption of an executory contract in the form of a trademark license agreement. The controlling statutory provision of the Bankruptcy Code[1] (§ 365(b][1]) is set out above. While there

---

1. Title I of the Bankruptcy Reform Act of 1978, Pub.L. 95–598, 92 Stat. 2683, enacted and codified as Title 11 of the United States Code, the "Bankruptcy Code", and all section references herein may be found in Title 11, unless otherwise indicated.

are a handful of cases that have construed this subsection, most deal with leases, and none are foursquare in resolving the controversy herein.

Luce Industries, Inc. ("Luce or Debtor") entered into a license agreement with Fruit of the Loom, Inc. ("Fruit of the Loom"), dated November 1, 1978, whereby Luce was given exclusive use of the Fruit of the Loom trademark in the manufacturing of certain types of ladies' clothing. On June 19, 1980, an involuntary Chapter 7 petition was filed against Luce. Permissibly, the Debtor filed a voluntary Chapter 11 petition converting the case from liquidation to reorganization, § 706, on June 24, 1980. On July 22, 1980, Fruit of the Loom, by an Order to Show Cause, moved to terminate the above license agreement with Luce.

The Order to Show Cause proceeded upon two grounds. First, Fruit of the Loom claimed that the Debtor had failed to cure numerous defaults arising under the license agreement within a thirty-day period requiring that they be cured, and hence, the license had terminated prior to bankruptcy, leaving nothing for a trustee. Second, it was alleged that there was a total inability on the part of the Debtor to assume the contract by satisfying Section 365(b)(1) of the Code, and for that reason, the license must be terminated.

In summary form, Fruit of the Loom, enumerated the following violations:

1. The Debtor had not timely submitted (or did not submit at all) for approval, prior to sale, proper samples of the clothing to be manufactured.

2. The Debtor sold Fruit of the Loom trademarked clothing of a quality inferior to that agreed upon.

3. The Debtor violated territorial restrictions.

4. The Debtor did not maintain an expanding business.

5. The Debtor sold clothing with Fruit of the Loom's trademark slovenly embroidered.

6. The Debtor refused to honor the replace or refund return policy.

7. The Debtor failed to pay license fees.

8. The Debtor failed to properly and timely submit sales reports.

9. The Debtor failed to pay its share of advertising fees.

10. The Debtor failed to submit an advertising "hangtag" for approval and a lawsuit was instituted by a third party because of the unauthorized use of a picture on the hangtag.

The Debtor, desperate to keep its most essential asset and assume the license agreement, served an opposing affidavit that controverted most of the allegations.[2] The Debtor also asserted that the termination motion was but part of a continuing scheme by Fruit of the Loom to transfer its exclusive license to a company named Comtec Enterprises, Inc., a company that had earlier shown interest in assisting or buying into the Debtor, but who was now negotiating independently and directly with Fruit of the Loom and had already won a license for jeans, which the Debtor claims is in violation of its own license agreement.

Hearings commenced July 29, 1980. At this time, Fruit of the Loom, in a posthaste effort to receive an award of termination, agreed to forego its pre-bankruptcy license termination claim, provided, the Court conduct a prompt hearing on whether the Debtor could meet the requirements of Section 365(b)(1).[3] The oral motion was granted.[4]

---

2. Procedure for the Court's approval of assumption of executory contracts, including the method of initiating such approval and any notice required is an area to be covered by new rules of bankruptcy procedure. *See*, H.R.Rep. No.95–595, 95th Cong., 1st Sess. (1977), 295, U.S.Code Cong. & Admin.News 1978, p. 5787.

3. Transcripts, July 29, 1980, pp. 14, 34. *See also*, Transcripts August 13, 1980, pp. 2–3; Au-

gust 20, 1980, p. 2; and September 4, 1980, pp. 18, 23–24, 40.

4. A final determination on the merits was subject to an expedited briefing schedule; however, curiously, although a prompt determination was requested, the parties on their own volition, extended the briefing schedule an additional five weeks (Transcript September 19, 1980, pp. 54–55.)

The Debtor is obligated by its license agreement to pay royalties of 3% on its gross sales, with a minimum fee of $180,000 due this year. Although there was no financial default by the Debtor prior to the entering of the Order for Relief, $15,000 became due on June 30, 1980 and an additional $45,000 on September 30, 1980 for a total of $60,000.

The Debtor freely admits to its $60,000 financial default and its failures to properly and timely submit representative production samples. However, the other defaults are vigorously contested.

To salvage its license agreement and comply with Section 365(b)(1) the Debtor devised a two-part plan. Part One is a "manufacturing capability package" and Part Two is a "money package". The two-part proposal involves agreements with two other parties—Fashion House, Inc. ("Fashion House") and S&S Venture Associates Ltd. ("S&S").

Fashion House is in the business of "jobbing merchandise", which consists mainly of "off price" (discount) clothing. It was established in 1968 and has an impressive, expanding sales record, along with a sizeable and growing stockholders' equity. The company projects sales for 1980 of $15–19 million.

As Part One of the Debtor's plan, "the manufacturing capability package", (described in testimony and in a letter agreement submitted in evidence), Fashion House has agreed to act as the Debtor's contractor and arrange for the manufacture of finished garments in accordance with quality standards mandated by the license agreement. An independent sales force will also be provided and Fashion House will further arrange for the leasing of a showroom in the New York City garment district.

Compensation to Fashion House will include the direct cost of manufacture plus a 22% markup to cover other expenses. To protect itself, Fashion House will take back as collateral an assignment of the accounts receivable generated by the Debtor's sales, which its factor will purchase for a charge of between ⅞ and 1 percent to guarantee payment. No credit is provided.

Fashion House asserts that samples could be ready in a two to three week time frame with full production only constrained by the availability of production facilities. On a best case/worst case estimate, it would take six weeks to three months for full production. Limited production might be available immediately if unrelated present merchandise Fashion House was acquiring, satisfied Fruit of the Loom.

S&S is a federally licensed small business investment company. It has a capitalization of $510,000, which S&S plans to increase to one million dollars in 1981 so as to increase its lending limits. As Part 2 of the Debtor's plan, "the money package", (described in testimony and in a letter agreement submitted in evidence, S&S will provide the Debtor with a $100,000 unsecured loan so that the Debtor can meet its financial defaults and having working capital. It is also prepared to loan another $100,000 to the Debtor in 1981.

Bernard Sandler, one of three principals of S&S, is also a partner in the certified public accounting firm employed by the Debtor. Mr. Sandler demonstrated thorough familiarity with the Debtor's financial situation and prospects. In addition, his accounting firm is familiar with this type of client in general and is on retainer for several other licensees in the garment or related fields whose licensed trademarks include such currently fashionable names as Christian Dior, Yves Saint Laurent, Ralph Lauren, Fabrege, Charlotte Ford, and Adele Simpson. Through his testimony, a favorable outlook regarding the ability of the Debtor to succeed in fulfilling the license agreement within the confines of its proposal was presented.

Specifically, Mr. Sandler testified that the arrangement called for a "healthy", though somewhat lower profit margin than was formerly maintained, (a reduction on gross profits from 38% to 30%). The new arrangement, he explained, would eliminate a principal problem that led to the Debtor's

financial conjuncture (meeting production deadlines). More importantly, according to Sandler, there would be sufficient profits to meet the minimum license fee requirements.

To compensate S&S for the loan, it will charge interest at a rate of 15% in a combination equity lending arrangement. Specifically, twenty-five percent will be capital stock and the remainder will be self-liquidating debt with a prepayment privilege, which S&S will subordinate if necessary. S&S will also become a thirty percent minority stockholder, but this interest will be subject to a repurchase option by the Debtor.

Fruit of the Loom's key objection to the Debtor's proposal is that the terms of the Fashion House and S&S agreements are too general and nebulous, and further, that as of the date of the hearing all terms were not fully negotiated.

In addition to the Fashion House and S&S agreements, the record is replete with promises by the Debtor to perform to the letter of the license agreement.

In its closing argument (and for the first time) Fruit of the Loom brought several new concerns to light. First, it alleged that the license agreement established massive actual pecuniary damage. The provision in question was a liquidated damage clause which provides that where the contract is *terminated* because of defaults by the licensee, the measure of damages shall equal one year's minimum royalty ($180,000 this year). In related argument, Fruit of the Loom charges that the Debtor's defaults damaged the goodwill and trademark of the company and that this is compensible under § 365(b)(1)(B).

Finally, and in category by itself, Fruit of the Loom complains that the proposed deal with Fashion House and S&S contemplates a change in the ownership of Luce that will ipso facto create a new default. The license agreement has certain limitations on changes in licensee ownership.

Section 365 of the Bankruptcy Code controls executory contracts. If a trustee wishes to assume an executory contract under which there has been a *default*, he must comply with § 365(b)(1).

Section 365(b)(1) (set out in full at the beginning of this opinion) enumerates a conjunctive tripartite test. The debtor must a) cure or provide adequate assurance that it will cure defaults; b) compensate or provide adequate assurance that it will compensate the other party for any actual pecuniary loss resulting from defaults; and, c) provide adequate assurance of future performance.

■ The subsection applies to defaults that occurred either before or after the commencement of the case. *See*, 2 *Collier on Bankruptcy* § 365.04 (15th Ed. 1980) at 365–30.

Application of immediate cure and compensating for actual pecuniary loss will usually be relatively simple. In his scholarly and copious article, *Executory Contracts and Unexpired Leases in the Bankruptcy Code* (hereinafter "Executory Contracts Article") 64 Minn.L.R. 341 (1980), Prof. Fogel explains:

> To assume a contract . . . under Section 365(b)(1), the trustee must cure the default and compensate pecuniary losses caused by the default. Generally, this will be straightforward. If the debtor has missed one rent installment, the trustee can cure by paying that installment.

*Id.* at 356. *See also, In re A. R. Dameron & Assoc.*, 3 B.R. 450, 1 C.B.C.2d 1110, 1113 (Bkrtcy. N.D.Georgia 1980).

The alternative to immediate action, providing "adequate assurance", is not so simple. The phrase "adequate assurance" is new; it was not found in the former 1898 Bankruptcy Act. *Collier on Bankruptcy* provides this clarification and explanation:

> There is no general definition of the term "adequate assurance" thus leaving its meaning to case by case development based upon the facts and circumstances of each case. It should be noted, however, that while the trustee is required to act promptly with respect to the cure and compensation for loss, in the appropriate

case it is possible for the cure or compensation for loss to be something other than immediate cash payment.

2 *Collier on Bankruptcy* § 365.04 (15th Ed. 1980) at 365–30.

■ Application of both alternatives is highlighted by *In re Bronx-Westchester Mack Corp.*, 4 B.R. 730 (Bkrtcy. S.D.N.Y. 1980). In this case, the debtor had entered into a distributor agreement with a manufacturer and subsequently defaulted. The debtor wished to assume the contract. In discussing the financial default by the Debtor in terms of § 365(b)(1)(A), the Court resolved:

> 1. The default under the contract currently amounts to approximately $150,000. Before the debtor may expect performance by Mack [the manufacturer] it must cure the default by payment or adequate assurance that this sum will be paid. Such assurance must be in the form of cash or collateral that is nonspeculative, positive and sufficiently substantial so as to assure Mack that it will realize the amount of the default.

*Id.* at 734. The Court's opinion is clear. A promise or similar lesser assurance will not be adequate to cure a monetary default.

Besides curing and compensating, the Debtor must provide adequate assurance of future performance. The legislative history to the Bankruptcy Code reveals that the Commission on the Bankruptcy Laws of the United States[5] adopted the phrase from Section 2–609 of the Uniform Commercial Code ("U.C.C.").[6] The Commission's report stated:

5. Established by Pub.L. No. 91–354, 84 Stat. 468 to study, analyze, evaluate, and recommend changes in the substance and administration of the bankruptcy laws of the United States.

6. Official text; promulgated by the American Law Institute and the National Conference of Commissioners on Uniform State Laws.
Sec. 2–609 Right to Adequate Assurance of Performance
(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be im-

> The language quoted is adapted from Uniform Commercial Code § 2–609(1). What constitutes ... "adequate assurance of future performance" must be determined by consideration of the facts of the proposed assumption. *Cf.* Official Comment 4 to Commercial Code § 2–609 (1972 Ed.). It is not intended, however, that any non-debtor party should acquire greater rights in a case under the Act than he has outside the Act.

Report of the Commission on the Bankruptcy Laws of the United States H.R. Doc.No. 137, 93d Cong., 1st Sess. [1973] Pt. II at 156–7. ("Commission Report")

Fogel, (acknowledging and examining these antecedent roots) suggests: "the meaning of adequate assurance of due performance in Section 2–609 of the U.C.C. should approximate the meaning of adequate assurance of future performance in Section 365(b)(1) of the Bankruptcy Code." *Executory Contracts Article, Supra* at 357.

Official Comment 4 to U.C.C. § 2–609 (referred to in the Commission Report) provides:

> What constitutes "adequate" assurance of due performance is subject to the same test of factual conditions [used to determine whether there are grounds for insecurity]. For example, where the buyer can make use of a defective delivery, a mere promise by a seller of good repute that he is giving the matter his attention and that the default will not be repeated, is normally sufficient. Under the same circumstances, however, a similar statement by a known corner-cutter might well be considered insufficient without the posting of a guaranty or, if so de-

paired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

\* \* \* \* \* \*

manded by the buyer, a speedy replacement of the delivery involved. By the same token where a delivery has defects, even though easily curable, which interfere with easy use by the buyer, no verbal assurance can be deemed adequate which is not accompanied by replacement, repair, money-allowance, or other commercially reasonable cure.

Comment 4 also provides a caselaw example (pre U.C.C.) of its principles. In *Corn Products Refining Co. v. Fasola*, 94 N.J.L. 181, 109 A. 505 (1920), the seller demanded that the buyer (Fasola) provide him with cash or security for ordered goods after the buyer failed to claim an early payment discount that he previously utilized on a regular basis. The seller had also heard rumors (though false) that the buyer's financial position was shaky. In response, the buyer sent the seller a good credit report from his banker and affirmed his willingness to make payments as due. This, according to the comment, constituted sufficient adequate assurance of due performance. Fogel, applying this reasoning in the context of § 365(b)(1), concludes that "A trustee who showed the Court that he had adequate cash to pay a supplier and promised to pay the supplier could cite *Corn Products Refining Co.*, and Official Comment 4 to support his assertion that he had furnished adequate assurance of performance under 365(b)(1) of the Bankruptcy Code." *Executory Contracts Article, supra* at 357. Fogel's comments are indeed sound.

*Kunian v. Development Corp.*, 165 Conn. 300, 334 A.2d 427 (1973), is a case widely cited for its application of U.C.C. § 2–609. The defendant-buyer owed the plaintiff-seller money for goods he had purchased. The parties met to discuss the problem of the defendant's nonpayment. The seller demanded assurance from the buyer that he would pay the outstanding indebtedness before the seller would make future deliveries. The buyer promised to make these payments' however, he failed to follow through, and in fact, *repeatedly* broke his promise. The Court concluded that the seller had reasonable grounds for insecurity and was justified in his later stringent de-

mand that the buyer deposit in escrow the entire amount due under the contract before he would make future deliveries. *Accord* U.C.C. § 2–609 Official Comment 4 (repeated occasions for application of § 2–609 are cumulative in determining the sufficiency of adequate assurance).

Two final caselaw capsules should suffice to impart the flavor of § 2–609. In *AMF v. McDonald's Corp.*, 536 F.2d 1167 (7th Cir. 1976), adequate assurance would have been supplied to the insecure buyer by a promise from the seller that his goods (electronic cash registers) would meet certain quantitative performance standards. *Id.* at 1169 and 1170, N.7. In *Appeal Productions Unlimited, Inc.*, 3 U.C.C. Rept. Serv. 620 (Veterans Admin. Contract App. Bd. 1966), adequate assurance required a film distributor to secure a certificate from the owner of the television rights of a rented film stating that the film, (in accordance with the distributor's rental agreement), would not be shown on television during the rental period.

Few bankruptcy cases have flirted with the concept of adequate assurance of future performance.

*In re Sapolin Paints, Inc.*, 5 B.R. 412, 2 CBC2d 854, 6 B.C.D. 776 (Bkrtcy.E.D.N.Y. 1980) (a lease assignment and assumption case) held that the economic conditions (the market rental rate was far in excess of lease rate and subleasing was contemplated) provided the best assurance of future performance. According to the Court, under the "factual conditions" there was little chance of the lessor not getting the benefit of his bargain.

The Court in *In re Bronx-Westchester Mack, supra* at 735, noted the requirement for adequate assurance of future performance, but went no further.

Assumption on the condition that financial defaults (owing to both the lessor and others supplying services) be promptly cured was allowed in *In re Belize Airways Limited*, 5 B.R. 152 (Bkrtcy.Ct. S.D.Florida 1980). Further, adequate assurance of future performance was supplied by a sizeable

(three month) security deposit, which the Court in a curious footnote said was correlated to § 361 adequate protection. (Procedurally, it should be noted that in this case the lessor moved for relief from the automatic stay, § 362, to evict the lessee, which may explain, partially, the entanglement of § 361. See § 363(e).)

Where a lessee-debtor, who was unable to himself cure, compensate, and provide adequate assurance of future performance, attempted to substitute a sublessee whose sublease conflicted with the terms of the master lease and who could not be shown to even be able to comply with the master lease, adequate assurance of future performance was found lacking. *In re Greco*, 3 B.R. 18, 6 B.C.D. 98 (Bkrtcy. M.D.Hawaii 1980).

Lastly, in *In re Taylor Manufacturing Inc.*, 6 B.R. 370, 6 B.C.D. 1161 (Bkrtcy. N.D.Georgia 1980), the Court held the trustee's showing that the assignee he planned to substitute had a history of paying its debts and, (as indicated by its financial statements) was a company of substantial net worth, provided adequate assurance of future performance. *Accord In re Lafayette Radio Electronics Corp.*, CCH Bkcy. Rpt. ¶ 67,706 (Bkcy.Ct. E.D.N.Y.1980).

In general, the cases and comment reveal an identifiable theme. Section 365(b)(1) attempts to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for [7] and the right of the debtor's creditors to get the benefit of the debtor's bargain. *See, Executory Contracts Article, supra* at 388; *Cf. Queens Boulevard Wine & Liquor Corp. v. Blum*, 503 F.2d 202 (2d Cir. 1974). Nowhere is the tension between these interests, and the difficulty in striking the balance, more apparent than in trying to determine whether there is the requisite adequate assurance of future performance.

"The terms, 'adequate assurance of future performance' are not words of art; . . . they were intended to be given a practical pragmatic construction." *Sapolin Paints, supra* at 420. "The determination . . . revolves around the nature of the parties involved, their prior dealings, the present contract and what solution is truly 'equitable' given the composition of the mix of facts." 2 Bkr.L.Ed. § 1562 at 58.

█ No single solution will satisfy every case. In the cases earlier cited by way of example—promises, sufficient financial backing, economic conditions, certificates, credit reports, escrow deposits or other similar forms of security or guaranty, have sufficed to provide adequate assurance of future performance (or due performance). This Court, is in agreement, however, with Professor and Practitioner, Patrick A. Murphy, that the assurance required "will fall *considerably short* of an absolute guaranty of performance." P. Murphy, *Creditors' Rights in Bankruptcy*, § 9.10 at 9–11 (Shepard's 1980) (emphasis added).

█ On the basis of the foregoing discussion and on the facts and circumstances of this case, it is concluded that Luce has met its burdens under § 365(b)(1). Luce's testimony (the promises therein) and its procurement of the Fashion House and S&S agreements, has more than shown a willingness *and* ability to succeed in providing Fruit of the Loom with the benefit of its bargain. More importantly, the financial defaults will be immediately cured in full through the infusion of capital by S&S. Luce has further committed itself to rectify

---

7. The legislative history states:

The unenforceability of ipso facto or bankruptcy clauses proposed under this section will require courts to be sensitive to the rights of the nondebtor party to executory contracts and unexpired leases. If the trustee is to assume a contract or lease, the courts will have to insure * that the trustees' performance under the contract or lease gives the other contracting party the full benefit of his bargain.

House Report No. 95–595, 95th Cong., 1st Sess. (1977) 348; *See*, Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 59, U.S.Code Cong. & Admin.News 1978, p. 6304.

* Additional comment that follows this, as well as § 365(b)(1)'s legislative history in general, makes it clear that the word "assure" and not "insure" was intended.

curable nonfinancial defaults [8] (i. e. submission of proper reports and samples) and its promise (in combination with its other efforts) is adequate assurance. Lastly, Luce's procurement of the necessary manufacturing capability through its contractor, Fashion House, satisfies the requirement of adequate assurance of future performance.

Moreover, the Debtor has acceded to the pertinent demands Fruit of the Loom set forth in its pre-bankruptcy demand letter (Exhibit C to the OSC). If these suggested cures and assurances would have satisfied Fruit of the Loom immediately before Luce requested the Order for Relief, they should suffice post-bankruptcy. This is not to say, however, that the assurance provided must be that requested. So long as the assurance is adequate, it will satisfy the statute.

■ It is a basic presumption in our system of law that parties to a contract will proceed in good faith in fulfilling their contractual obligations. *See, Roscoe Pound,* I *Jurisprudence* at 413–5; U.C.C. § 1–203. Every single detail need not be hammered out and amplified as it seems Fruit of the Loom desires. Luce's proposal is not ephemeral or ethereal. Nor was it established at the hearing that Luce has a history of defaulting in its obligations, thus mandating a stringent standard in determining the sufficiency of the adequate assurance. See *Kunian* (and following comment) *supra.* Further if necessary, Fruit of the Loom is free to return to this Court and seek additional relief, which if instituted by an order to show cause, would receive attention on an expedited basis.

This Court will not give Fruit of the Loom a guaranty on future performance. Nor will the Court give Fruit of the Loom greater rights than it had before. In argument, Fruit of the Loom demanded that which its original agreement with Luce

does not provide. The Court in *Sapolin Paints, supra,* faced with a similar request, appropriately responded:

> What the Code requires is that the lessor be given the performance for which he has contracted. Examination of Sapolin's lease shows that nowhere has Sapolin [the debtor] promised not to permit the premises to become vacant or abandoned. * * * The landlord cannot insist that the bankruptcy law gives him what the lease does not. . . .

*Id.* at 420. It is apparent, Fruit of the Loom would like to rewrite the license agreement (i. e. there is *no* requirement that Luce, itself, manufacture, maintain a certain net worth, or maintain inventory). As the Court stated at trial, the only concern of this Court is to compare the old Luce with the new Luce, and this Court finds the proposed Luce greatly improved.[9] *Accord. Commission Report, supra* and *see also Pittsburgh-Des Moines Steel v. Brookhaven Manor,* 532 F.2d 572, 583 (7th Cir. 1976) (Cummings, C. J., concurring under U.C.C. § 2–609.)

Several additional arguments need yet to be resolved. Fruit of the Loom would like to extricate trademark license agreements from other executory contracts. There is no statutory or other authority for this. A license agreement is an executory contract, no more, no less. Only shopping center leases are singled out for special treatment. *See, In re Lafayette Radio Electronic Corp., supra* at 78,272; § 365(b)(3).

Second, the debtor's defaults do not of and by themselves establish *actual* pecuniary damage to the trademark and good will of Fruit of the Loom which must be compensated for under § 365(b)(1)(B). Damages must be proven. In this instance, there must be a showing of damage in the market place. Anything else would be purely speculative and not "actual". Fruit

---

8. Fruit of the Loom has not convinced this Court that many of the alleged license transgressions took place, or if they did, to any significant extent. Further, the violations alleged in the demand letter, Order to Show Cause, testimony, and briefs are bereft of syzygy.

9. This Court is also not unmindful of Fruit of the Loom's apparent desire to bring "Comtec Enterprises" to center stage and procure a healthier bargain than it has with Luce. See transcripts: July 29, 1980, pp. 4, 19, 23; August 13, 1980, p. 17; September 19, 1980, p. 28.

of the Loom has simply not met this burden.

Nor, does the license provision, which provides for liquidated damages, establish any measure of actual damage. First, by the license agreements own terms, the provision only applies in the case of a termination, and here, there has been none. Second, rather than establishing "damages", the clause, (as Fruit of the Loom would apply it), is in the nature of a penalty. Moreover, the provision is akin to a lease acceleration clause, which are made unenforceable by the Code. Under § 1124(2) a trustee may reverse acceleration of a claim by reinstating its maturity and providing a plan that cures nonfinancial defaults and compensates for damages due to the defaults. To allow Fruit of the Loom to use this provision as a basis for establishing its damages would entirely vitiate the limitation on compensation for pecuniary losses. Sound advice is provided to Fruit of the Loom in the legislative history:

> The intervention of bankruptcy and the defaults represent a temporary crisis which the plan of reorganization is intended to clear away. *The holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain.* Curing of the default and the assumption of the debt in accordance with its terms is an important reorganization technique ... (emphasis added)

Senate Report No. 95–989, 95th Cong., 2d Sess. (1978), 120, U.S.Code Cong. & Admin. News 1978, p. 5906.

Third, Fruit of the Loom, grasping at straws in post-trial argument, claims that the Debtor's proposed plan is unsatisfactory because it contemplates a change of ownership in violation of a covenant in the agreement. This argument is not made in good faith.[10] It is evident from a November 14,

1978 rider attached to the license agreement that Fruit of the Loom's only concern in restricting ownership was that Marvin Lefkowitz maintain his position as full time Chief Executive Officer and control the company's day to day affairs. This leadership role will remain unchanged under the Debtor's proposal. Further, this is not the type of default truly contemplated by the statute. § 365(b)(1) looks to providing the nondebtor with performance under the contract, and this the Debtor has adequately assured Fruit of the Loom it will receive. Clearly, the equities here, weigh heavily in favor of the Debtor. *Cf. Queens Boulevard Wine & Liquor Corp. v. Blum*, 503 F.2d 202 (2d Cir. 1974).

Fourth, Fruit of the Loom's demands regarding the legal action surrounding the allegedly nonapproved hangtag are without merit. First, the allegation has not been proved with sufficient evidence.[11] Second, Luce has fully complied with its obligations by taking necessary steps to protect both itself and Fruit of the Loom from potential liability. Finally, the *ad damnum* does not establish a default that must be cured or establish actual pecuniary loss that must be compensated for. Further, nor does this *speculative* amount (in what may comprise a nuisance suit) enter into the formulation of adequate assurance of future performance, even if the Debtor is obligated to hold Fruit of the Loom harmless. To find otherwise, in the face of such uncertainty, would have a chilling effect on the ability to assume executory contracts, a result clearly not intended by Congress.

Lastly, this Court finds that no assignment has taken place necessitating compliance with § 365(f) & (c). Fruit of the Loom's argument that Luce assigned the agreement is disingenuous. On one hand, it complains that the Debtor's proposal is an impermissible assignment, while on the other hand, it complains that neither S&S nor

---

10. The Debtor argues that Fruit of the Loom's vehement opposition is rooted in its license agreement with "Contec Enterprises", which is allegedly in violation of the Debtor's exclusive license agreement. *See* Note 9, *supra.*

11. In general, Fruit of the Loom spent most of its energy attempting to ravage the Fashion House and S&S agreements and discredit the Debtor's promises, and not proving the alleged nonfinancial defaults. *See* Note 8, *supra.*

Fashion House has assumed the obligations of the license, and therefore, it is not adequately assured of future performance. Further, by agreement of the parties, the hearing was limited to 365(b)(1).[12]

ORDERED, the Debtor may assume the license agreement in accordance with its proposal. It is FURTHER ORDERED, that the Debtor shall have a reasonable time period in which to cure any additional subsequent defaults occurring during the hiatus while this matter was *sub judice*.