### In re GENERAL OIL DISTRIBUTORS, INC., et al., Debtors.

#### Bankruptcy No. 882–80516–20.

United States Bankruptcy Court,
E. D. New York.

March 29, 1982.

Levin & Weintraub, Weisman, Celler, Spett, Modlin & Wertheimer, New York City, for debtor; Barry Seidel, Steven L. Cohen, New York City, of counsel.

Kaye Scholer, Fierman, Hays & Handler, Attys. for Marine Midland Bank, New York City, Gerald Feller, New York City, of counsel.

New York City Law Dept. Office of the Corp. Counsel, New York City; Arnold Fox, New York City, of counsel.

Brener, Wallack & Hill, Princeton, N. J., for Royal Petroleum Corp.; Nathan M. Edelstein, Princeton, N. J., of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Northville Caribbean Corp.; Jay Himes, New York City, of counsel.

Gehrig, Ritter, Melville, N. Y., Cable, McDaniel, Bowie & Bond, Baltimore, Md., for Crown Central Petroleum Corp. by Morton A. Sacks, Baltimore, Md., Craig R. Olsen, Melville, N. Y., of counsel.

Gordon, Hurwitz, Butowski, Baker, Weitzen & Shalov, New York City, for Tipco Products Co., Mt. Airy Trading Co., The Augsbury Corp., Koch Fuels, Inc.; Kent T. Stauffer, New York City, of counsel.

ROBERT JOHN HALL, Bankruptcy Judge.

General Oil Distributors, Inc. ("General") moves this Court for authorization to assume its executory contract for the sale of oil to the City of New York ("the City"). Authorization is denied.

The instant case was commenced by the filing of an involuntary petition under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701 *et seq.* (Supp. IV 1980) on 3 March 1982 which was followed two days later by General's conversion to a voluntary petition under Chapter 11. *See id.* at § 706(a).

Thereafter, by orders to show cause dated 10 and 12 March 1982 and returnable on March 15, General moved for Court approval of a financing package which General had negotiated with Marine Midland Bank, N. A. ("Marine"), its prebankruptcy financier, and for authorization to assume its executory contract with the City.[1]

Hearings on the consolidated motions were held on March 15 and 17–19, at which time the Court denied authorization to assume the contract, whereupon General withdrew its application for approval of the financing package.[2]

In accordance with Bankruptcy Rules 752 and 914, the Court is now filing its Findings of Fact[3] and Conclusions of Law.

General is one of about a half dozen subsidiaries of Southville Oil Corporation, a holding company all of whose stock is owned equally by the brothers Allen and Gerald Wechter. Like General, some of

---

1. General also moved to assume its executory contracts with the State of New York which was granted upon New York State's consent.

2. Court approval of General's assumption of the contract was apparently a condition precedent to Marine's obligation to advance any funds under the financing package.

3. In order to facilitate a speedy review of these proceedings (should such be sought), the Court has drafted these Findings of Fact from its notes rather than waiting for the transcription of the hearing minutes.

these subsidiaries buy and sell petroleum products. Others own and operate petroleum storage facilities which are apparently analogous to warehouses. At present, in addition to General, Wechter Petroleum Corporation ("Wechter"), Southville Industries Corporation ("Southville") and Inwood Trucking Corporation ("Inwood") are operating as debtors-in-possession under Chapter 11.[4]

Prior to General's filing, General had a financing arrangement with Marine under which, in return for a continuing security interest in all of General's accounts receivable, Marine would advance General 80% of those accounts classified as "eligible" at an interest rate of 3% over prime. In addition, General's obligations to Marine are guaranteed by both Inwood and Southville.

Although apparently successful in the past, General has more recently found itself in financial difficulties due to several factors: first, General apparently lost large sums of money speculating in the commodities market; second, the brothers found themselves engaged in a power struggle for control of the holding company with the concomitant legal expense such entails; and third, a buyer refused to pay for some $1,000,000 of petroleum products allegedly sold and delivered to it by General claiming a set-off.

Consequently, on 10 March 1982, General represented to this Court that it was out of money, out of oil and out of time and requested ex parte authorization to borrow $300,000.00 from Marine to avoid immediately defaulting on its standing contracts. In return for this loan, Marine was to be granted, *inter alia*, a security interest in General's postpetition accounts receivable,[5] the right to collect these in reduction of General's outstanding prepetition obligations to Marine and the vacatur of the automatic stay that it might collect on the prepetition receivables (upon which it already had a security interest). Based on General's representations of an emergency situation, ex parte approval was granted[6] and a hearing on General's request for authorization to borrow an additional $400,000 on like terms was scheduled for 15 March 1982 on notice to General's 14 largest unsecured creditors.[7]

At the hearing, General testified by Gerald Wechter that the intra family dispute between he and his brother had been reconciled and that General was no longer speculating in the commodities market. General then offered a program of cost cutting under which it projected a monthly cost reduction of $107,000. Finally, General argued that a cash infusion of $700,000 coupled with the re-activation of the Marine accounts receivable financing arrangement would enable it, in light of its proposed cost rehabilitative posture, to embark on a successful reorganization.

The creditors[8] were uniform in rejecting this analysis. Although presumably representing diverse interests and without the benefit of a creditors' committee (which had not yet been formed), the creditors took umbrage with General's projections. One of the creditors, Northville Caribbean Corporation ("NCC"), cross-examined Gerald Wechter on the basis of General's figures suggesting that they in fact foretold a cash

---

4. Inwood and Southville filed voluntary petitions simultaneously with General's conversion. Wechter filed a voluntary petition 16 March 1982. The cases are presently being administered jointly.

5. Pursuant to section 552(a), the commencement of the case automatically nullifies the effect of an after acquired property clause in a security agreement.

6. A hearing on the propriety of this order in light of *In re Texlon Corporation*, 596 F.2d 1092

(2d Cir. 1979) has been scheduled for 29 March 1982.

7. It is yet to be determined if those creditors notified were in fact the 14 largest.

8. By the term "the creditors", the Court is referring to the half dozen or so creditors who noted their appearances during the hearings conducted during the week of March 15. These creditors allegedly represented many millions of dollars of possibly unsecured debt.

flow deficiency of over $100,000 over the next three months. *See* NCC exhibits 1–9.[9]

Although probably insufficient by itself to short circuit General's reorganization plans, this counter analysis by NCC was then greatly buttressed by the revelation that General had borrowed (without Court approval) an additional $300,000 in petroleum products from apparently sympathetic competitors during the pendency of these hearings that General might avoid defaulting further on its contracts. Although this fact supported General's contention that a true emergency (in terms of General's survival) existed, it concurrently confirmed NCC's position that a $700,000 cash infusion would do little to keep this company alive. In other words, General was now shown to have already received $600,000 ($300,000 in cash from Marine and $300,000 in products from competitors) while forced to admit that it was once again out of money and oil only one week later.

It is against this factual background that General asked for authorization to assume its contract with the City of New York.

### The City Contract

The City contract, which had been awarded to General through competitive bidding, commenced on 1 July 1981 and terminates on 30 June 1982. The contract calls for the supplying by General of, *inter alia*, 1,200,-000 gallons of # 2–D fuel oil to the Newtown Creek Water Pollution Control Plant ("Newtown Creek"), 4,000,000 gallons of # 2–D fuel oil to the Staten Island Ferry Terminal ("the Ferry") and 500,000 gallons of # 2–D fuel oil to the Wards Island Water Pollution Control Plant ("Wards Island"). Moreover, this contract provides for a fixed price per gallon over its life. Consequently, the present drop in the market price of oil makes this contract a valuable asset to General who therefore sought to assume it. Conversely, the City preferred to have it terminated that they

might solicit newer (and presumably lower) bids on the balance of the contract term.

Section 365(b)(1) provides the tripartite conditions precedent for the assumption of an executory contract by a debtor-in-possession. *In re Lafayette Radio Electronics Corporation,* 9 B.R. 993, 997 (Bkrtcy.E.D.N.Y.1981); *In re Luce Industries, Inc.,* 8 B.R. 100, 105 (Bkrtcy.S.D.N.Y.1980).

Section 365(b)(1) provides:

If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1). Accordingly, the threshold inquiry is into whether there has in fact been a default.

The testimony of the City's two witnesses, which the Court finds credible, was that the City ordered a barge load of oil for the Staten Island Ferry Terminal on 19 February 1982 with a scheduled delivery date of 26 February 1982. On the 26th, however, no delivery was made. Moreover, the officers of General refused to answer the City's phone calls which sought an explanation of when delivery would be made. Therefore, Mr. Beckerman (one of the City's two witnesses) visited General's offices on 2 March 1982 and was informed that General had no oil to then deliver to the Ferry nor to Newtown Creek (which was apparently also

---

**9.** It was also established that company morale was very low and that several key employees including virtually the entire accounting department had resigned a few days prior to the commencement of these proceedings. This, of course, cast further doubt on both the figures offered at these hearings and General's ability to function effectively at all.

then in need of oil). Consequently, on or about 10 March 1982, the City purchased approximately $265,000 worth of oil on the spot market. The witnesses estimated that at that time the Ferry had only enough oil to run one or two more days. Shutting down the Ferry, they added, would have stranded 65,000 commuters. Finally, although the City conceded that it had suffered no pecuniary damages due to the drop in the market price of oil, Mr. Beckerman suggested that unless the City paid these replacement suppliers their $265,000 prior to the March 25 due date for the next delivery (an occurrence he could not be sure of) he had severe reservations as to his ability to procure more oil in a similar telephone-contract "trust me" manner.[10]

Based thereon, it is clear to the Court that there was a default. However, inasmuch as this default engendered no monetary damages, it follows that there is nothing to cure. Accordingly, General could assume the contract provided it could provide adequate assurance of future performance.

### Adequate Assurance

The concept of adequate assurance of future performance is one borrowed from section 2–609 of the Uniform Commercial Code. Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc.No.137, 93rd Cong., 1st Sess. [1973] Pt. II at 156–57. Accordingly, the case law under U.C.C. section 2–609 has been held applicable to section 365(b)(1)(C). *In re Sapolin Paints, Inc.*, 5 B.R. 412, 420–21 (Bkrtcy.E.D.N.Y.1980); *accord, In re Luce Industries*, 8 B.R. at 105.

In general section 365(b)(1) attempts to strike a balance between the interest of the estate in preserving (or disposing of at a profit) a valuable asset and the interest of the nondebtor party to the contract in receiving its bargained for performance. *Id.* at 107.

What constitutes adequate assurance is a factual question to be determined on a case by case basis with due regard to the nature of the parties, their past dealings and present commercial realities. *In re Sapolin*, 5 B.R. at 421; *accord, In re Luce*, 8 B.R. at 107. *See also* U.C.C. § 2–609 Official Comment 4.

Applying the foregoing to the case at bar, the Court cannot ignore the reality of who the nondebtor party to this contract is. It is the City of New York; and the oil is needed that the Staten Island Ferry might run and that several waste treatment plants might be able to process refuse prior to its disposal at sea. Nor can this Court ignore the precarious financial position that General has been shown to be in; nor the fact that General has defaulted on past deliveries; nor the fact that General is presently out of oil and out of money; nor the fact that the sufficiency of the additional $400,000 loan to stabilize this company has been put in serious question.

Accordingly, although the Court realizes that denying General this contract may be tantamount to a death blow delivered virtually at the birth of these proceedings, the public interest at insuring that vital public services are maintained demands a higher standard of assurance of performance from the debtor-in-possession, which burden it has not carried.

Accordingly, authority to assume the City contract must be denied.

---

**10.** There was also some evidence to the effect that General had been late with deliveries prior to the commencement of these proceedings. There was no evidence, however that the City ever had to cover except as indicated *supra.*