**In re ANGLO ENERGY LIMITED, Anglo Company, Inc., Anglo Industries, Inc., Debtors.**

**Bankruptcy Nos. 83 B 11614–83 B 11616 (ER).**

United States Bankruptcy Court, S.D. New York.

Aug. 1, 1984.

Cleary, Gottlieb, Steen & Hamilton, New York City, for debtors.

Stroock & Stroock & Lavan, New York City, for Official Committee of Unsecured Creditors.

Bishop, Liberman & Cook, New York City, for Official Debenture Holders Committee.

EDWARD J. RYAN, Bankruptcy Judge.

On November 4, 1983 Anglo Energy, Ltd. (Anglo), Anglo Company, Inc. (ACI) and Anglo Industries, Inc. (AII) each filed a petition for reorganization under Chapter 11 of the Bankruptcy Code (Code). 11 U.S.C. § 1101, *et seq.*

The Chapter 11 reorganization proceedings of Anglo, ACI and AII are being jointly administered and each of them continues to operate its business as debtor in possession. 11 U.S.C. § 1107.

Official Debenture Holders, Unsecured Creditors and Equity Holders Committees have been appointed. 11 U.S.C. §§ 1102, 151102.

Anglo is principally engaged through its subsidiaries in land contract drilling of intermediate and deep oil and gas wells on the north slope of Alaska, the U.S. Rocky Mountains region and in western Canada; in oil field transportation and sub-part services in Alaska and in oil field construction in Alaska.

ACI is a wholly owned subsidiary of Anglo and serves as a holding company for all of its operational subsidiaries. AII is a holding company subsidiary of ACI.

By order to show cause and application dated March 19, 1984 the debtors sought to have this court enter an order authorizing the assumption of nine employment contracts and employee stock option agreements and the institution of a management incentive compensation program.

Neither the official Debenture Holders Committee, Creditors Committee, nor Equity Security Holders Committee opposed the assumption of Mr. Rhodes' contract. All of the parties also supported the assumption by the debtor of the Management Incentive Compensation Program and Employee Stock Option Plan. Accordingly an order authorizing the debtors to assume the Rhodes contract, compensation program and stock option plan was entered on April 30, 1984.

The eight remaining employment contracts provide for a three-year term of employment and termination benefits in the event of a change of control of the debtors or a sale of all or substantially all of the debtors' assets. In the event of a merger, consolidation or sale, the employees may elect to treat such event as discharge without cause unless the successor entity will or purchaser agrees to assume all of the debtors obligations under the contract. Pursuant to the terms of each contract, discharge without cause entitles the employees to receive cash termination payments ranging from six months to twelve months salary.

To create a further inducement to remain in the employ of debtors and to provide an incentive for the debtors early emergence from Chapter 11, the debtors and the Creditors and Debenture Holders committees agreed that the termination benefits of each debtor's executives (other than Mr. Rhodes) provided for in their employment agreements would be modified to provide that a bonus equal to one-third of the cash termination payment be payable to each

executive upon debtors' confirmation of a plan of reorganization on or before September 1, 1984 or on such later date as agreed to by debtors and committees. In the event that confirmation is not achieved by such agreed date, no confirmation bonus would be paid. If the bonus is paid, the termination payment would be reduced by one-third.

The termination benefits payable to the employees whose contracts are opposed by the committees total in excess of $250,000.

Evidentiary hearings on Anglo's application were held on April 23, April 30, May 1 and May 2, 1984.

The decision to consider granting employment contracts to certain "key employees" was made at a June 27, 1983 meeting of the Compensation Committee of the Anglo Board of Directors.

The eight employees whose contracts are the subject of the application are as follows:

Thomas A. McKay, vice-president, chief financial officer and treasurer, $66,000.

Frances J. Nester, vice-president, general counsel and secretary, $95,000.

Richard A. Stratton, vice-president and controller, $78,000.

John Owen, manager of financial analysis, $65,000.

Eugene J. Heaney, assistant controller, $62,000.

E. Phillip Hanlon, division controller, $58,000.

David Mochizuki, manager of engineering, $56,000.

Joseph Ferrari, assistant controller, $47,000.

Prior to entering into these contracts none of the eight employees had written employment contracts. Six of the eight contracts were entered into in September, 1983. Joseph Ferrari's and John Owen's contracts were entered into post-petition on or about February 1, 1984.

The debtors have brought to the Court's attention the fact that John R. Owen and E. Phillip Hanlon have announced that they will be leaving the debtors' employ within the next two months to seek other employment. Therefore, the debtors withdraw the portion of the application which seeks to assume the contracts of these two individuals.

The Equity Security Holders Committee supports the debtors' application. The Equity Committee, however, does object to the inclusion in each of the employment contracts of a bonus of one third of termination if a plan is confirmed by September 1, 1984 on the ground that such provision puts undue pressure or management to file a plan.

The Debenture Holders Committee supports the assumption of the employment contracts of Messrs. McKay, Stratton and Nester for the reason that they are executive employees whose continued employment appears to be necessary to the debtors' rehabilitation and opposes the assumption of the employment contracts of Messrs. Heaney, Hanlon, Mochizuki and Ferrari for the reason that these employees are not key employees. Additionally, the Debenture Holders Committee asserts that there is no evidence that neither Heaney, Hanlon, Mochizuki nor Ferrari will terminate his employment if his contract is not assumed. The Committee points out that the termination provisions are not customary for these particular employees.

Finally, the Debenture Holders Committee states that the estates will not be benefitted by the assumption of the contracts it opposes.

Except for Mr. Rhodes' contract, the Official Committee of Unsecured Creditors opposes the assumption of all of the employment contracts on the ground that the assumption of the employment contracts contains disincentives to the prompt reorganization of the debtors' estate. The Committee urges that this court give "strict scrutiny" to these employment contracts, since it amounts to self dealing among the individual employees of the corporation and the compensation committee of Anglo. The Creditors Committee also claims that the employment contracts en-

tered into were in contemplation of a Chapter 11 filing.

The debtors contend that they should be allowed to assume the employment contracts, since to do otherwise would interfere with the legitimate exercise of their business judgment. Further, the debtors argue that these employment agreements will assure continuity of the present management team and thereby avoid disruptions to the reorganization process. The debtors claim that these termination benefits are by no means excessive, since the customary practice in the industry is to grant at least six months' termination pay to similarly situated employees.

The debtors respond to the claim of insider dealing by asserting that the contracts at issue were negotiated at arm's length with an independent committee of the debtors' board of directors.

The debtors state that the Creditors Committee had at one time agreed to support the disputed application and had extracted certain concessions from the debtor.

■ The pre-petition employment contracts of McKay, Nester, Stratton, Heaney and Mochizuki are executory contracts within the meaning of Section 365(a). The Code and its corresponding legislative history does not set guidelines for the courts to apply in determining whether the judgment of a debtor in possession to assume or reject an executory contract should be approved. As a result of the Code's silence the same standards applied by the courts under the moribund Bankruptcy Act (the Act) continue to be applied under the Code. Under the Act, the courts applied a "business judgment" test whereby the debtor was required to demonstrate that the assumption or rejection would benefit the estate. See *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul, Pacific, R.R. Co.*, 318 U.S. 523, 550, 63 S.Ct. 727, 742, 87 L.Ed. 959 (1943), 2 *Collier on Bankruptcy* 365.03 at 365–14 (15 ed. 1983).

■ The court finds that the debtors' business judgment in this situation is misguided.

The incentive program and stock option plan as adopted by the debtors and approved by this court on April 30, 1984 provide sufficient job security and assurance to these employees, and preempt the need for additional benefits in the form of three-year employment contracts with special bonus and termination pay provisions.

Under the court approved one-year management incentive program the amount of incentive compensation is based on the achievement of a targeted positive consolidated operating cash flow. The targeted positive consolidated operating cash flow is based upon the annual operating plans prepared by the management of the debtors' subsidiaries and is limited to cash flow within the control of management. An incentive bonus of five percent of salary would be paid if the company achieves a targeted positive consolidated operating cash flow of $6,000,000 in the fiscal year ending September 30, 1984. For each additional $500,000 in each cash flow above the $6,000,000 target, an additional bonus of one percent of salary would be paid up to a maximum of 15 percent of salary. It is estimated that implementation of the plan at the debtor management level would cost the company (as applicable to the eight management employees) only an aggregate of $28,300 if the targeted cash flow of $6,000,000 is achieved and a maximum of $84,900 if a consolidated positive operative cash flow of $11,000,000 is achieved. Additionally, an option to purchase one share of Class A stock under the company's existing stock option plans would be granted on the date that the bonus is paid for each $10 bonus earned by an executive. The grant of options will total 2,830 shares if targeted cash flow of $6,000,000 is achieved and 8,490 shares if cash flow of $11,000,000 is achieved.

The stock options granted to the employees are also an integral part of their compensation. The number of stock options granted and the date granted are set forth

in Exhibit J to the Debtors' application. Options granted under the plan become exercisable one year after they have been granted in cumulative annual installments of twenty-five percent. They expire 10 years after they have been granted. Generally, the stock option plans provide for the grant of options at an exercise price equal to the market price of the subject stock on the date of the grant of the option.

On December 19, 1983 the Anglo Board of Directors removed the freeze on the management employees' salaries which had been in effect since June, 1982. The Board decided to authorize salary increases of 8 percent effective as of January 1, 1984 in order to partially compensate management employees for the cost of living increases for the last two years. The Board also did this out of the realization that it was important to retain the services of these key employees. The base salaries stated in the employment agreements have been raised by 8 percent with the exception of Mr. Rhodes whose base salary has not been raised. The only employee to receive more than an eight percent raise was Mr. McKay who received a raise of 18 percent.

The debtors assert that the three-year employment agreements are necessary to "give each individual deserved comfort as to his rights concerning his employment, and to thereby allow them to devote their full attention to the necessary task at hand and to better ensure the continued service of these individuals in the employ of these debtors."

The Court is mindful of the leeway a debtor in possession should be given in the exercise of its business judgment. The Court is also sympathetic to the debtors' desire to retain its management team; to avoid the possible cost in time and expense in hiring new employees, and to add to the employees' sense of job security.

Clearly, any corporation in the process of a Chapter 11 reorganization faces uncertainty as to its future. Employees of such companies may often find it more advantageous to seek more secure surroundings. Nevertheless, the Court should not be constrained to accept the debtors' generous award of compensatory benefits when in the early stages of the reorganization process the employees have already been granted substantial incentives to remain with the company.

The debtors seek to assume the post-petition employment contract of Joseph Ferrari.

Section 365(a) is not applicable to post-petition contracts. However, for the same reasons articulated in denying debtors' leave to assume the pre-petition employment contracts, the Court finds that the Ferrari contract is not necessary to preserve the debtors' estate. 11 U.S.C. §§ 503(b)(1)(A), 1107(a).

These proceedings have had an undercurrent of tactical maneuvering. It may well be that opposition to this application is at least inspired in part by the ongoing negotiating process, but that fact has not affected the Court's decision.

Accordingly, the debtors' motion is at this time denied.

It is so ordered.