**In re FOOD CITY, INC., Debtor.**

**Bankruptcy No. 88–51685–C.**

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

Dec. 12, 1988.

See also, Bkrtcy., 95 B.R. 451.

Randolph N. Osherow, San Antonio, Tex., for Food City, Inc.

David S. Gragg, Jeffers, Brook, Kreager & Gragg, Inc., San Antonio, Tex., for First Republic Bank–San Antonio, N.A.

Bruce Waitz, San Antonio, Tex., for Creditors Committee.

Ben Steinhauser, Burms and O'Gorman, San Antonio, Tex., for Mendez Bros. Produce.

## ORDER DENYING MOTION TO ASSUME EMPLOYMENT CONTRACTS WITHOUT PREJUDICE

LEIF M. CLARK, Bankruptcy Judge.

At San Antonio, Texas, on the 7th day of December, came on for hearing the motion of Debtor to assume certain executory employment contracts and the responses thereto by NCNB–Texas National Bank and by the Official Creditors' Committee. Upon consideration thereof,[1] the court finds and concludes that the best interests of the estate will best be served by denying the motions to assume, without prejudice to their assumption upon confirmation of the plan.

### FACTUAL BACKGROUND

Food City is a discount grocery food chain with annual sales in excess of $50 million. It had been a profitable operation from its first full year of operation in 1977 through 1985, though profits fell commencing in 1984. It lost money thereafter and finally filed this bankruptcy petition in June 1988. The debtor attributes its reversals to the downturn in the Texas economy which raised unemployment, cutting into the chain's customer base, the lower middle class shopper. The debtor also contends that its lender's discontinuation of the debtor's line of credit and summary enforcement of technical default provisions in its loan agreements had a significant negative impact on the debtor's cash flow.

For the last eight or nine years, the debtor has been headed by the same management team. In 1986, an employee stock ownership plan ("ESOP") was formed incident to the employees' acquisition of the company's stock. The ESOP incurred $5.2 million worth of debt to fund the buyout, pledging the ESOP's stock in Food City as collateral. The ESOP will have to infuse additional capital post-confirmation or lose its equity position in the company entirely. Most management team members have an interest in the ESOP.[2]

In May 1988, one of the company's key senior management officials left the company. The board of directors[3] then took

---

1. After initially announcing its ruling from the bench, the court heard an oral motion for reconsideration by the debtor and took the matter under advisement. This decision reinstates that original ruling and denies the oral motion for reconsideration.

2. No evidence was presented whether the interest is vested, but in view of the ESOP's balance sheet and illiquidity, the issue is largely irrelevant. Nonmanagement employees also hold interests in the ESOP.

3. The board had consisted of four members, but two resigned in 1986 while a third died in November 1987. The company has not been able to replace these board members, largely because of its inability to obtain errors and omissions insurance coverage, without which it is difficult in today's litigious climate to convince persons to serve on the boards of companies experiencing financial difficulties.

action to place the rest of management under contract. Employment contracts were executed in early June, just days before the bankruptcy filing. The contracts assured each employee severance pay of six months salary, plus an additional month of salary for each additional month the employee remained with the company, up to a total benefit of not more than one year's salary.[4] The benefit was to be paid in the event the employee was laid off or in the event the company was sold and the employee not retained.[5] In the event of a triggering default, the maximum exposure of the company would be about $279,000.

The debtor now seeks to assume these employment contracts, arguing that they are essential to the morale of the management team that is in turn essential to the successful reorganization of the debtor. Unless the key employees are assured a "safety net" in the event reorganization proves unsuccessful, they will be unwilling, according to the debtor, to continue assuming the risk of employment with Food City and will likely instead go elsewhere.[6]

NCNB and the Committee each argue that assumption is not in the estate's best interest, pointing out that this same management team presided over the company's slide into bankruptcy. They also note that none of these employees previously had contracts, yet continued to work for the company even during successive years of loss. The Committee is especially concerned about the administrative expense claim with priority over unsecured creditors that would arise if the contracts, once assumed, are breached. 11 U.S.C. § 365(g)(2). In a chapter 7 case especially, the $279,000 liability that would accrue would virtually eliminate any recovery for the unsecured creditor body. Finally, both

parties note the chilling effect the contracts would have on the company's being acquired by a third party once the contracts were assumed, because a new buyer would either have to keep existing management or buy them off by paying off their contracts.

## ANALYSIS

Section 365(a) authorizes the estate to assume or reject executory contracts "subject to the court's approval." 11 U.S.C. § 365(a). The decision to assume or reject requires a balancing of the contract's benefits and burdens. In the context of rejection, this balancing is usually couched in terms of the "business judgment" test, under which a trustee need not affirmatively prove that a contract is burdensome in order to justify its rejection. *See In re Richmond Metal Finishers,* 756 F.2d 1043, 12 BCD 1281 (4th Cir.1985); *In re Chi-Feng Huang,* 23 B.R. 798, 9 BCD 972 (9th Cir. BAP 1982); *In re Turbowind, Inc.,* 42 B.R. 579, 12 BCD 362 (Bankr.S.D.Cal.1984). When the issue is assumption, the focus usually turns to the estate's ability to cure outstanding defaults and assure future performance, so the business judgment test is seldom referenced. *See Matter of Luce Industries, Inc.,* 8 B.R. 100, 7 BCD 78 (Bankr.S.D.N.Y.1980); *In re Harry C. Partridge, Jr. & Sons,* 43 B.R. 669, 12 BCD 481 (Bankr.S.D.N.Y.1984). The ultimate issue in either event is still essentially the same, however. When assuming, the trustee must decide what benefit is to be gained by staying with the contract versus the burden thereby assumed. *Matter of C.M. Systems, Inc.,* 64 B.R. 363, 364, 14 BCD 1076, 1077 (Bankr.M.D.Fla.1986). When rejecting, the trustee must balance the ben-

---

4. Some of the contracts specified an initial three months of salary, rather than six months. By the date of the hearing, four of the seven contracts were "filled out."

5. Post-bankruptcy, the benefit would be paid if the case were converted to a chapter 7 proceeding or if a competing plan proposed acquisition by a third party not interested in retaining existing management.

6. Only one employee left the company prior to the execution of these contracts. One employee

has indicated an intention to leave since the contracts were signed. Only the debtor's president, Curtis Scheh, testified at the hearing. He himself is under one of the contracts, but admitted that he would stay with or without the contract. He could not say with a certainty what others would do, though he knew that it would be "a tremendous blow to morale" if he had to go back to them with the news that the contracts had not been assumed.

efit foregone against the burden of which the estate is being relieved. *In re Chi-Feng Huang*, 23 B.R. at 801. The Second Circuit correctly underscored the need for a flexible test: "the trustee and ultimately the court, must exercise their discretion fairly in the interest of all who have had the misfortune of dealing with the debtor." *Matter of Minges*, 602 F.2d 38, 43 (2d Cir. 1979); *see also Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 318 U.S. 523, 550, 63 S.Ct. 727, 742, 87 L.Ed. 959, 999 (1943).

Focusing on the relative benefits and burdens associated with assuming these executory contracts, the court makes the following observations:

1. Assumption of the contracts would tend to build *esprit de corps* in the management team, contributing positively to the chances for successful reorganization.

2. Assumption would tend to promote continuity and stability on the management team, again promoting reorganization values.

3. Assumption would tend to operate as a "poison pill" working to discourage hostile takeovers, tending to diminish the ability of parties other than the debtor to propose alternative plans of reorganization.

4. Assumption would create a contingent administrative claim against the estate which, in the event of a conversion to chapter 7, would virtually eliminate any recovery by the unsecured creditor body.

5. Management already has a vested interest in the company with at least a potential for return, namely, their holdings in the ESOP.

6. The ESOP is itself insolvent. Only by an additional cash infusion will holders of interests in the ESOP even be able to retain their interests under a plan, absent the consent of all other creditors.[7]

7. Once the contracts are assumed, management could conceivably reap a windfall by allowing the company to slip into chapter 7 if there are any unencumbered assets, especially if management, from its favorable vantage point, concludes that a reorganization has no real long-term economic prospects.

8. The contracts were entered into on the eve of and in apparent contemplation of the bankruptcy filing, as part of the management team's pre-bankruptcy planning.[8]

9. A plan of reorganization has already been promulgated and is to be confirmed by no later than March 15, 1989.

10. The exclusivity period has not expired yet, and will not expire unless the debtor is unable to confirm a plan by March 15, 1989. Until then, other creditors cannot file competing plans.[9]

11. Employment contracts are a relative rarity in the retail grocery business, and none of these employees had such contracts prior to June 1988.

12. If the debtor's plan is confirmed, with or without employment contracts, current management would likely be retained.

13. If the case converts, or these employees are laid off, they should receive some sort of severance pay.

14. A guarantee of one full year's salary in the event of failure is a very generous safety net of severance pay.

15. All of the current management team can legitimately be classified as key personnel.

16. With assumption, management will hold a contingent administrative claim.

---

7. The ESOP will only have value to its current interest holders if they can inject even more risk capital into the company. Even then, they may not be able to retain their interests in the face of opposition. The continuing vitality of the *Case v. Los Angeles Lumber* exception to the absolute priority rule has recently been questioned by the U.S. Supreme Court. *Norwest Bank Worthington v. Ahlers*, — U.S. —, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988).

8. The court observed from the bench and here reiterates that it finds no bad faith here. To the contrary, this particular sort of pre-bankruptcy planning in many cases makes good sense.

9. Both the Committee and NCNB have indicated a serious intention to file competing plans if given the opportunity.

Using Section 1129(a)(9), management could conceivably block or frustrate a competing plan.

Balancing these factors is an inherently equitable and thus immensely fact-sensitive exercise. *See In re Anglo Energy, Ltd.,* 41 B.R. 337, 340–41 (Bankr.S.D.N.Y.1984). Were the court to enjoy the freedom to modify the terms of the contracts, it might be able to craft a palatable Solomonic solution. That option is not available, however. *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir.1985); *see In re Nitec Paper Corp.,* 43 B.R. 492 (S.D.N.Y.1984).[10] Despite the intangible benefits which would no doubt accrue to the estate by assuming these contracts, the burden on the creditors is too great to overlook. If the debtor's plan in fact succeeds, then assumption of these contracts under that plan would seem the appropriate reward for their efforts. If the plan should fail, however, assumption of these contracts would only confer undue leverage on management, working to undermine (or even override) the absolute priority rule. *See* 11 U.S.C. § 1129(b).

All that is currently before the court is a request for approval of assumption of these contracts at this stage of the bankruptcy. A refusal of that request at this time does not prevent the debtor from again seeking that approval later in the proceedings. *Cf. In re Anglo Energy, Ltd., supra* at 341. With this in mind, the court denies the debtor's request to approve assumption of the employment contracts *at this time,* without prejudice to the debtor's seeking such approval at a later date, including as part of the debtor's plan of reorganization.

So ORDERED.

---

**10.** In *Institutional Investors,* Justice Douglas, in discussing the assumption or rejection of a lease in a railroad reorganization, commented that "[t]hus, the question whether a lease should be rejected and if not on what terms it should be assumed is one of business judgment." *Id.* Under the Bankruptcy Code, the estate no longer has the option to decide under what terms it will assume an executory contract, but must instead either assume it as written or reject it completely. *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir.1985). The business judgment test of Justice Douglas' day may no longer be as vital, given the hard choice the Bankruptcy Code forces on the estate.