The **QUAKER OATS COMPANY,**
Plaintiff,

v.

**L. T. BURNETT et al., Defendants.**

Civ. A. No. 2050.

United States District Court
E. D. Tennessee,
Northeastern Division.

Feb. 27, 1968.

See also D.C., 289 F.Supp. 280.

Kramer, Dye, Greenwood, Johnson & Rayson, Knoxville, Tenn., for plaintiff; R. Arnold Kramer and David E. Rogers, Knoxville, Tenn., of counsel.

Bacon & Dugger, Morristown, Tenn., for defendants; John F. Dugger, Morristown, Tenn., James W. Dorsey, Atlanta, Ga., of counsel.

## MEMORANDUM OPINION AND ORDER

NEESE, District Judge.

The plaintiff Quaker sued the defendants Burnett on two certain promissory notes, including interest and attorneys' fees, and on an open account. Exclusive of interest and fees judgment was sought for $496,296.29.

The Court granted Quaker a partial summary judgment for $60,000 as the balance on one of those notes, *viz.*, dated April 12, 1965, and directed a verdict for Quaker in the sum of $356,629.40 on the second note of September 25, 1965 and for $809.33 on the open account. A jury awarded Quaker judgment for $28,370.60 on the latter note and for $11,319.58 on the account. When the accrued interest was computed, the Court added to the overall judgment an aggregate of $69,992.06 for accrued interest and reserved the question of attorneys' fees.

Now confronting the Court is the perplexingly difficult duty of ascertaining what portion of the obviously substantial compensation due Quaker's attorneys herein should be borne by the defendants Burnett. The problem has been the subject of much cogitation by the Court since December 15, 1967, when the aforementioned judgment was entered.

Sometime in the spring[1] of 1965, Mr. L. T. Burnett, the chief operating partner of the defendants, noticed a marked decline in the production of eggs in the Burnetts' comparatively extensive integrated poultry producing and processing operations. This became a matter of overriding concern for the Burnetts and Quaker's representative, who was assigned to help them, for several months. Multiple investigations of the probable cause were made.

The size of the Burnetts' open account with Quaker reached large proportions at times, resulting in the aggregating of

---

1. Quaker's representative testified that this occurred in the fall of 1965, but this is not corroborated by other testimony.

the amounts and their reduction to the form of promissory notes. Of the two notes coming to the Court's attention in this and companion litigation, one[2] contained the provision that: " * * * If this note is placed with an attorney for collection because of default, we * * * promise to pay a reasonable amount as attorneys' fees. * * *"

During the progress of the extensive and intensive investigations mentioned, an official of a Quaker feed plant advised one of the Messrs. Burnett that its laboratory technicians had reported, following analytical tests of samples of feed taken from the Burnetts' operations, that the feed contained a contaminating drug, nicarbazin. Mr. Burnett was counselled not to worry by this official, who expressed his opinion that Quaker was "* * * big enough to pay for any mistakes it makes. * * *"

The Burnetts, evidently relieved by this assurance, and confident that the necessary adjustments would follow, made the promissory note for $385,000, interest and attorneys' fees on default in payment, to Quaker and renewed same, with the same provisions, on September 25, 1965. The due date thereon was Christmas Day, 1965.

Subsequent to the initial laboratory test, Quaker's technicians were informed that the sample theretofore tested also included a nitrofuran. Nicarbazin and nitrofurans producing similar reactions in the test to which the samples were subjected initially, further testing by Quaker's technicians resulted in their amended report that there was no nicarbazin present in the samples.

The foregoing assurances given the Burnetts, the amended report of Quaker's laboratory technicians, and other tests and examinations inspired by the Burnetts, produced a heated controversy between the parties as to legal responsibility for the alleged contaminant's presence in breeder-hen feed concentrate sold by Quaker to the Burnetts. Apparently Quaker wanted the Burnetts to pay their notes and open account, and the Burnetts wanted a satisfactory adjustment of their claim against Quaker before paying.

Quaker instituted this action in this Court on November 18, 1966, but before process herein was served on the Burnetts, they had instituted an action in damages against Quaker in a state court.[3] The Burnetts then made the basis of a counterclaim herein the same claim laid for their action in damages in the state court. The matter was not put to rest until the jury herein returned a verdict for Quaker in the companion case, civil action no. 2056, D.C., 289 F. Supp. 280, and a verdict for Quaker herein on those parts of the note of September 15, 1965 and the open account owing by the Burnetts to Quaker, which then remained in dispute between the parties.

It cannot be seriously doubted that from the viewpoints[4] of the novelty and difficulty of the issues herein, the skill and eminence of counsel who opposed Quaker's counsel herein, the time[5] required to be expended by counsel for Quaker, the probable loss of other employment while counsel were so engaged, the skill and standing of Quaker's counsel, the great value to Quaker of the interests it had involved directly and indirectly in the outcome of this litigation, the ability of the litigants involved to

---

2. Stipulation III(d) of the pretrial order of March 1, 1967 to the contrary notwithstanding, the Burnetts' promissory note of April 12, 1965, in the principal amount of $150,000, includes no such provision. See Exhibit "C" to the complaint herein.

3. The state action was removed to this Court, 28 U.S.C. §§ 1441(a) and 1332(a) (1), and tried with this action.

4. The viewpoint of the contingency of the fee as depending on success in collection is not considered pertinent to this decision, because of the solvency of Quaker.

5. Leading counsel for Quaker testified that his firm devoted 1,100 man-hours of work to the preparation of this action for trial, and ten trial days were required.

pay a fair fee, the results secured for Quaker by their counsel, the customary charges in this area for similar services, the inflated cost of living, and office overhead expenses, the attorneys for Quaker qualify eminently for substantial compensation for their professional services. Quaker was in dire need of the effective assistance of able counsel. It was confronted, not only with the prospect of losing the recoupment of substantial amounts from the Burnetts if the latter could establish a failure of consideration because of the alleged presence in the feed sold of the contaminant, and not only with the prospect of an adverse judgment for damages in six figures, more importantly, Quaker was in peril of the prospective loss of a valuable business reputation it could ill afford to surrender. As has been said in this District in a case involving the fixing of a fee in a Tort Claims action: " * * * This was a close case,[6] and [Quaker's] counsel has handled it in an expert manner. * * *" Cf. Seeber v. United States, D.C.Tenn. (1964), 232 F. Supp. 68, 71[4].

■ " * * * In this state a fee * * * provided for in a note is a constitutent part of the obligation, enforceable by or in behalf of the holder of the note * * *." Jenkins et al. v. Harris et al., C.A.Tenn. (1935), 19 Tenn.App. 113, 122[10], 83 S.W.2d 562, 567, certiorari denied (1935); Noone v. Fisher, D.C. Tenn. (1942), 45 F.Supp. 653. "* * * Generally speaking, a stipulation in an instrument to pay attorneys' fees is in the nature of an indemnity contract, and the promisee can recover thereunder only such sums as he * * * necessarily expended or became liable for on account of the default of the promisor. * * * What may be a reasonable fee in a particular case must depend to some degree on the facts thereof. 7 Am. Jur.

869, Bills and Notes § 142. * * *" Anno: Provision for Attorneys' Fees, 41 A.L.R.2d 677, 678 § 1.

■ Leading counsel for Quaker and two distinguished members of the bar of this Court testified that a fee of ten per cent (10%) of the amount of principal and interest[7] recovered was reasonable in this situation. Such expert opinion testimony is advisory only. Trice v. Hewgley, C.A.Tenn. (1964), 53 Tenn.App. 259, 381 S.W.2d 589, 594[6]. The amount of an attorney's fees " * * * is peculiarly within the discretion of the Court because the attorney is an officer of the court. * * *" Noone v. Fisher, supra, 45 F.Supp. at 656[9]. The reasonableness of the allowance " * * * is to be determined upon a consideration of all the facts and circumstances presented by the record, primarily the amount involved and available, the nature of the responsibility assumed by the attorneys, the character and extent of the services which they have performed, not only in the technical litigation itself, but also in matters arising out of and incidental to such litigation. * * * These matters are within the domain of legal knowledge, and, therefore, opinion testimony by lawyers of experience and reputation is admissible as expert testimony to assist the Court. But the Court, on the theory that judges have first hand experience and knowledge of the subject, is the final arbiter, and is not bound by the opinion of the professional legal experts who testify.

" 'The allowance * * * should be an exercise of judicial discretion, founded upon the knowledge of the court making the allowance of *the real value of the services performed*, and should not be rested upon the testimony of experts as to the *general value* of professional services.' (Emphasis ours.) Hitchcock

6. See first full paragraph of this Court's memorandum opinion and order of February 7, 1968 in civil action no. 2056, this District and Division, 289 F.Supp. 280.

7. One of these witnesses, N. R. Coleman, Jr., Esq., testified that there should be added to this an amount to reimburse the attorneys for their actual expenses, but this note did not provide for all costs of collection, as many do.

v. American Pipe & Const. Co., 90 N.J. Eq. 576, 107 A. 267, 269.

"Except for these general principles, which are recognized * * * in the decisions of this Court [8] * * *, there is no formula, or set rule, by which the value of legal services may be appraised, and the amount which would represent reasonable compensation determined. * * * *" Carmack v. Fidelity-Bankers Tr. Co. (1944), 180 Tenn. 571, 581–582(8), (9, 10), 177 S.W.2d 351, 355(8), (9, 10).

This Court encounters great difficulty with the proposition that the $385,000 note was "* * * placed with an attorney for collection because of default * * *." True, it was placed with an attorney for collection. True, also, it was in default. However, the very same note had been more than three weeks in default in the fall of 1965, and Quaker abstained then from placing it for collection. It was drawing interest all the while. Quaker was chargeable with knowledge that the Burnetts were solvent.[9] The raging controversy between the parties was well known to Quaker's officials. The inference is strong that the note was placed for collection, not because of default, but because the utilization of this method would enable Quaker to (a) investigate and prepare its defense to the portending damage action of the Burnetts, (b) simultaneously prepare its rebuttal to the defense of the Burnetts that the notes and account were invalid to some degree for partial failure of consideration, and (c) perhaps impose some part of the expense of such investigation and preparation on the maker of the note. There was no legal limitation imminent on Quaker's action to collect the note at the time this action was commenced, and Quaker could have asserted its notes and open accounts as counterclaims to the anticipated damage suit by the Burnetts.

Services of a giant in the legal profession were not required to assert the claim of Quaker on the larger note. The complaint approximates a routine form. The motions for a partial summary judgment and for a directed verdict and supporting briefs presented routine matters, even for a fledgling lawyer. This Court disposed of the motion for a partial summary judgment in one paragraph and of the motion for a directed verdict in one short page. All that Quaker ever needed to demonstrate in these connections was the outer limits of the period in which the contamination issue was in dispute. It appears strongly that any equitable adjustment of the Burnetts' claim against Quaker would have resulted in immediate payment of the notes and open account.

■ While admittedly the exercise by this Court of its equity arm in so doing is severe, the Court cannot escape the finding and conclusion that, under the totality of all the facts presented and reasonable inferences flowing therefrom, it was unnecessary for Quaker to expend or become liable for the professional services of its counsel herein "* * * on account of the default of the promisor * * *", Anno: Provision for Attorneys' Fees, supra, to the extent of requiring the Burnetts to indemnify it for any of its attorneys' fees in connection with the collection of the note providing for such.[10] This Court interprets the decisional law of Tennessee to be that it is authorized to wholly disregard the expert testimony adduced, when in its

---

8. Even where a note calls for a specific percentage to be recovered on default as attorneys' fee, "* * * the court is not bound by a provision to the effect that any particular amount shall be allowed for such fees, and, no matter what stipulation as to the amount is made in the face of the note, it will not be enforced unless it appears reasonable to the court. * * * *" Holston Nat. Bank v. Wood (1911), 125 Tenn. 6, 16–17, 140 S.W. 31, 34.

9. This Court notices its records judicially, and the main judgment was satisfied by the Burnetts soon after its rendition.

10. If no legal expense was incurred as a result of the default of the debtor, no recovery can be had under an agreement for attorneys' fees. Kuper v. Schmidt (1960), 161 Tex. 189, 338 S.W.2d 948.

judgment the fees[11] are inequitable. Fiedler et al. v. Potter, et al. (1943), 180 Tenn. 176, 189(12), 172 S.W.2d 1007.

■ What was said in *Fiedler* appears to this Court to apply here " * * * The question is not whether * * * these attorneys performed services of a character and to an extent justifying the fees [sought], but whether these defendants should pay the bill, rather than the [client] these attorneys have well served. * * * " *Idem.* So finding and concluding in the instant situation, this Court hereby denies Quaker the recovery from the Burnetts of any of its attorneys' fees on the $385,000 note aforementioned.

11. No Tennessee case has been discovered where no fee at all was allowed.