**In re BON TON RESTAURANT AND PASTRY SHOP, INC., Debtor.**

No. 85B1755.

United States Bankruptcy Court, N.D. Illinois, E.D.

Oct. 10, 1985.

Robert R. Benjamin & Associates, Ltd., Chicago, for debtor.

Cory Lipoff, Nachman, Munitz & Sweig, Ltd., Joel Greenblatt, Foss, Schuman, Drake & Barnard, Chicago, for movant/landlord.

## MEMORANDUM AND ORDER

ROBERT L. EISEN, Chief Judge.

This matter was heard upon the motion of the debtor in possession, Bon Ton Restaurant and Pastry Shop, Inc. ("Bon Ton" or "debtor"), for authority to assume its unexpired lease of nonresidential real property under section 365(a) of the Bankruptcy Code. In opposition, the successor-lessor, Bernard A. Heerey ("Heerey" or "lessor") contends that a number of defaults exist under the lease which must be cured as a condition to assumption pursuant to section 365(b)(1) of the Code. For the reasons set forth below, the court, having carefully considered the pleadings, memoranda, exhibits, and oral argument, determines that Bon Ton has satisfied the requirements of section 365(b)(1) and may therefore assume the unexpired lease.

## BACKGROUND

On February 8, 1985, Bon Ton filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, and has continued to operate its business and manage its property as a debtor in possession. The lease in question was executed on April 6, 1981 for rental of the premises at 1151–53 North State Street, Chicago, Illinois, including storage space in the basement. The entire building in which Bon Ton operates its restaurant and pastry shop consists of four commercial units and twenty-four rental units. Heerey acquired title to the building in May, 1983, and is the successor-lessor of the premises, the lease term for which expires April 30, 1988.

On March 11, 1985, Heerey presented his motion to compel the debtor to correct certain unsafe and hazardous conditions as outlined in a report submitted by the lessor's former insurance carrier pursuant to inspections conducted in June and December of 1983 and April of 1984. The seven conditions enumerated in Heerey's motion consist of: (1) accumulation of grease in

the breaker box panel; (2) the absence of filters in the hood over the cooking area; (3) the inadequacy of the existing fire extinguishing system in the hood area;[1] (4) the absence of fire extinguishers in the kitchen area; (5) the fact that electric lights in the kitchen area were not encased; (6) the fact that the kitchen floor was in disrepair; and (7) the fact that the air conditioner was not in safe operating condition. Heerey claims that numerous demands were made upon the debtor to remedy these conditions, culminating in Heerey's declaration on January 21, 1985 that the lease was in default by reason thereof and his demand for possession of the premises. According to Heerey, Bon Ton represented on January 24, 1985, that it would correct these conditions and cure other defaults under the lease. Shortly thereafter, Bon Ton filed its Chapter 11 petition.

In response, Bon Ton affirmatively stated that its agent had inspected the premises from time to time and found the breaker-box panel free of grease accumulations, that an Ansul-type extinguishing system as well as fire extinguishers were in place on the premises, that the electric lights in the kitchen area were encased, that the kitchen floor was in repair, and that the air conditioner was in safe operating condition. The debtor denied that it was in default of any of the lease's terms, affirmatively stating that it was also in full compliance with all municipal code requirements.

On March 29, 1985, and within 60 days of the commencement of this case, Bon Ton filed its motion to assume the unexpired lease, stating that monthly rental payments were current and that all additional obligations, where required, were satisfied or otherwise set-off. A hearing thereon was held April 4, 1985. On that date, Heerey requested time to respond to Bon Ton's motion and was given until May 15, 1985. At the April 4th hearing, Bon Ton requested that its motion to assume be heard within the next sixty days, or before June 8, 1985, whereupon the court directed the parties to comply with a pretrial order by June 5th, set a status hearing for June 6th, and set the hearing on assumption for June 7, 1985.[2]

In his response, Heerey incorporated his prior motion to compel correction of safety hazards and claimed six existing defaults as of the time of Bon Ton's application to assume the lease: (1) failure to pay increased insurance costs resulting from the cancellation on January 1, 1985 of lessor's fire, extended coverage and public liability insurance policy due to the aforementioned alleged hazardous conditions; (2) failure to reimburse the lessor for the costs of rodding the common sewer line necessitated by overflowing of grease from debtor's grease trap; (3) failure to pay water rents in the sum of $100.00 per month since April, 1983; (4) failure to pay the remaining $1,000 installment of debtor's security deposit; (5) failure to obtain and maintain the necessary plate glass insurance and property damage and public liability insurance; and (6) failure to keep the demised premises in a safe condition and in good repair. In conjunction with the latter default, Heerey recited the existence of numerous additional unsafe and hazardous conditions described in detail in a report dated March 22, 1985 and prepared by a senior fire scientist engaged by the lessor.[3]

---

1. This court has previously ruled, pursuant to Heerey's motion to compel Bon Ton to replace the present extinguishing system or discontinue operations, that the installation of a replacement sprinkler system was the responsibility of the lessor under Illinois law and the terms of the lease. *In re Bon Ton Restaurant and Pastry Shop, Inc.*, Memorandum and Order, 55 B.R. 43 (Bankr.N.D.Ill.1985).

2. This court has already ruled that on April 4, 1985, the court granted Bon Ton an indefinite extension of time to assume its unexpired lease

pending resolution of the issues in the present Memorandum and Order. In so ruling, the court concluded that the lease was not deemed rejected pursuant to section 365(d)(4) of the Code as urged by the lessor in a related motion. *In re Bon Ton Restaurant and Pastry Shop, Inc.*, Memorandum and Order, 52 B.R. 850 (Bankr. N.D.Ill.1985).

3. These conditions include: (1) the existence of numerous extension cords connecting electrical equipment where permanent wiring ought to be installed; (2) the fact that wood framing is in

Pursuant to section 365(b)(1)(A) of the Code, Heerey contends that Bon Ton must cure all defaults,[4] both monetary and non-monetary, under the lease prior to court approval of assumption. In addition, Heerey states that Bon Ton must provide adequate assurance of future performance under the lease pursuant to section 365(b)(1)(C). Heerey particularly wants adequate assurance that Bon Ton will keep the premises in a clean, healthy and safe condition in the future but, paradoxically, objects to Bon Ton's assumption on the grounds that the debtor has not and cannot comply with section 365(b)(1).

At the hearing and in its memoranda, Bon Ton maintained that the only default was the failure to pay one month's rent and believed it could cure or provide adequate assurance of cure of monies in default. The other defaults are vigorously contested by Bon Ton, its position being that the current condition of the premises falls within the permissible guidelines set forth in the lease. However, if a default is found to exist, Bon Ton stands ready, willing, and able to provide adequate assurance of cure or compensation under section 365(b)(1) upon assumption.

At the conclusion of the June 7th hearing, the court determined that certain threshold legal questions surrounding the assumption of the lease should be decided on briefs, thereby avoiding the necessity for an evidentiary hearing since the only remaining issues appeared to involve the net amount due the lessor at the time of assumption and the debtor's ability to perform. The court pointed out at the hearing on June 7th that the existence of breaches which are not cause for termination of the lease are not pertinent to whether or not the debtor has a right to assume or reject the lease. Thereupon, the court took the following issues under advisement with respect to assumption of the lease: (a) whether the costs of rodding the common sewer line are the responsibility of the lessor or Bon Ton under the terms of the lease; (b) whether the lessor's increased insurance premiums pass through to the debtor under the terms of the lease; (c) whether the lessor's attorneys' fees and costs constitute a pecuniary loss to be borne by the debtor in assuming the lease; and (d) whether the debtor must cure non-monetary defaults as a condition precedent to assumption of the lease.

## DISCUSSION

■ Section 365(a) of the Bankruptcy Code[5] in conjunction with section 365(b)(1) provides a debtor in possession with the absolute right to assume an unexpired lease and to cure any defaults, subject to the court's approval. *In re Lionel Corp.,* 29 B.R. 694, 696 (Bankr.S.D.N.Y.1983). The aim of the statutory authority to assume a lease is to assist in the debtor's reorganization effort. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 348 (1977); *re-*

---

contact with the exhaust hood which could result in ignition; (3) the fact that the ceiling is cracked and in disrepair, thereby exposing wood framing near the cooking area; (4) the existence of combustible material surrounding the warming table which uses a manually controlled single gas burner; (5) the inadequacy of the small unmounted fire extinguisher; (6) the fact that the overhead electric light should be encased with a plastic cover and in its present state is a possible ignition source; (7) the fact that the floor is uneven and in disrepair; (8) the existence of clutter near the emergency exits and the fact that the main exit signs are not lighted; (9) the need for replacement of the flexible gas line running to the stove; (10) the existence of substantial grease build-up behind the stoves which is extremely combustible; (11) the existence of water running from the kitchen to the basement increasing the possibility of electrical short circuits; and (12) the accumulation of potentially combustible paper debris behind the freezers.

**4.** According to Heerey, the aggregate sum of the existing monetary defaults, at the time of his response filed May 22, 1985, was $37,598.24.

**5.** 11 U.S.C. § 365(a) provides in relevant part:
...[T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.
Section 1107(a) of the Code vests the rights, powers and duties of a Chapter 11 trustee in the debtor in possession. Therefore, references in section 365 as to what the trustee may do apply equally to a debtor in possession.

*printed in* U.S.Code Cong. & Admin.News 5787, 5963, 6304 (1978); S.Rep. No. 95–989, 95th Cong., 2nd Sess. 59 (1978) *reprinted in* U.S.Code Cong. & Admin.News 5787, 5845 (1978). If the lease is not in default, the debtor is entitled as a matter of course to the necessary court approval, *In re Sapolin Paints, Inc.,* 20 B.R. 497, 508 (Bankr. E.D.N.Y.1982), to assume an unexpired lease which appears to be in the best interests of the estate, *In re Lionel Corp.,* 29 B.R. at 696, and under which the debtor is able to perform. *In re Coast Trading Co., Inc.,* 26 B.R. 737, 741 (Bankr.D.Ore.1982). The requirement of court approval in the form of an express order, *e.g., Matter of Whitcomb & Keller Mortg. Co., Inc.,* 715 F.2d 375, 380 (7th Cir.1983), furthers the policy underlying the Bankruptcy Code "of maximizing the value of the estate for the benefit of all creditors, while preserving certain rights of parties to contracts with the debtor." *In re Kelly Lyn Franchise Co., Inc.,* 26 B.R. 441, 445 (Bankr.M.D. Tenn.1983).

If there has been a default, section 365(b)(1) provides that a debtor in possession may not assume an unexpired lease under section 365 unless, at the time of assumption, the debtor in possession:

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1)(West 1984). This subsection applies to both pre-petition and post-petition defaults, *In re Berkshire Chemical Haulers, Inc.,* 20 B.R. 454, 457 (Bankr.D.Mass.1982); *Matter of Luce Industries, Inc.,* 8 B.R. 100, 104 (Bankr.S.D. N.Y.1980). Section 365(b)(1) is intended to provide protection to the non-debtor lessor to insure that he receives the full benefit of

his bargain in the event of assumption. *In re Lafayette Radio Electronics Corp.,* 7 B.R. 189, 191 (Bankr.E.D.N.Y.1980). If no default exists, section 365(b)(1) is inapplicable in which case assumption of an unexpired lease may be ordered without regard to the cure, compensation and adequate assurance requirements. *In re Harry C. Partridge, Jr. & Sons, Inc.,* 43 B.R. 669, 671 (Bankr.S.D.N.Y.1984). Therefore, the initial determination to be made is whether any defaults exist under the unexpired lease which Bon Ton seeks to assume.

### Responsibility for Rodding Common Sewer Line

Heerey contends that Bon Ton is in default under the lease since it has not paid Heerey the sum of $4,387.36, representing the cost of rodding the sewer line which is common to the entire building. The rodding, according to Heerey, was necessitated by an overflow of grease from the debtor's grease trap. The relevant paragraphs of the lease are:

37. Lessee, at his own cost and expense during the term of the Lease, shall maintain the demised premises in attractive appearance and good condition, making such repairs, improvements and alterations of a non-structural nature so as to insure the aforementioned conditions. For the interpretation of this intention, this shall include all components of the demised premises and the facilities and utilities which service same. Upon termination of the Lease by lapse of time or otherwise, Lessee shall turn over possession to the Lessor in good condition, and except for normal wear and tear, shall repair all points of attachment effected by Lessee's trade fixtures when removed.

39. Lessor shall not be liable for any damage occasioned by breaks or ruptures of steam lines, plumbing, water, gas, electric, sewer, air ducts, overflow or the like, etc. in about and/or around, above and/or below the demised premises and/or the property of which it forms a part, contiguous and/or nearby properties, including tenants and/or occupants

of same. Common areas and arterial systems shall be given ordinary and reasonable care by Lessor.

Heerey argues that Bon Ton expressly contracted under paragraph 37 of the lease to maintain and repair the sewer line servicing the demised premises. On the other hand, Heerey states that under paragraph 39, the lessor is only obligated to use ordinary and reasonable care with respect to the common sewer line but is not obligated to maintain and repair such common arterial systems. The lessor further contends that the costs incurred in this regard resulted from Bon Ton's use and occupancy of the premises and therefore those costs pass through to the debtor under paragraph 42 of the lease. Paragraph 42 provides:

42. Lessee covenants and agrees that it will at all times keep the Lessor and its property harmless from any and all loss, liability, claims, suits, costs, expenses and damages, whether real or alleged, resulting from or caused in whole or in part by the Lessee's use and/or occupancy of the demised premises. This indemnification and protection shall be all inclusive, whether imposed by law, statute, ordinance, regulation or common law, custom or otherwise ... whether in effect now or as may be enacted by legislative action, regulatory body and/or judicial decree. To further enable the Lessee to comply with and implement the provisions of this Lease, Lessee will obtain, carry and maintain at its own expense at all times during this Lease or any extensions thereof, insurance and/or bonds of indemnification covering the Lessor and itself as follows:

a. Owners, Landlords & Tenants Public Liability and Property Damage insurance in amounts not less than $250,000 for one person/$500,000 for one occurrence for bodily injury, and $50,000 for Property Damage;

b. Workmen's Compensation insurance in the form and amount prescribed by the State of Illinois with limits not less than $500,000;

c. Dram Shop Insurance covering the aspects, responsibilities and hazards imposed by the Illinois Liquor Control Acts as now in effect or as may be amended or enacted from time to time hereafter in amounts not less than:

1. $250,000 for Bodily Injury to One Person.

2. $750,000 for Bodily Injury for one occurrence;

3. $750,000 for Loss of Means of Support;

4. $250,000 for Property Damage.

The above noted policies of insurance shall be deposited with the Lessor prior to their commencement date, and shall contain an endorsement providing that the Lessor is to be notified not less than ten (10) days prior to any cancellation by the insurance carrier. This shall not apply to the Lessor being named as a co-insured for the Workmen's Compensation insurance. The Dram Shop Insurance shall not be required unless the Lessee gives thirty (30) days notice prior to applying for a liquor license.

Failure to comply with the above insurance requirements shall be a breach of such seriousness and consequence that the Lessor may take such action as it shall deem in its best interest including the obtaining of insurance and/or closing the premises, the cost of any and all expenses in connection with such action shall be borne by Lessee and shall be due and payable to the Lessor upon rendition of bill for same as so much additional rental.

The aforementioned insurance and/or bonds of indemnity shall be in standard or better companies which shall be acceptable to the Lessor as shall the form, endorsements and should inflation and reasonable circumstances warrant Lessor may request an increase in the amounts of the limits originally specified. Lessee further agrees to pay as so much additional rent upon presentation of a statement therefor, any additional or supplemental premium which the Lessor's insurance carriers might demand

for Lessor's general liability and/or multi-purpose insurance by virtue of the Lessee's operations if such be related to the sale of alcoholic beverages only.

In reply, Bon Ton states that a reading of paragraph 37 of the lease in conjunction with paragraph 39 resolves any ambiguity and leads to the interpretation that Bon Ton agreed to repair and maintain any facilities and utilities only as they relate to the leased premises, whereas Heerey agreed to maintain them to the extent they constitute common areas and arterial systems.

In construing a lease, the principal function of a court is to give effect to the parties' intention as expressed in the document's language when read as a whole. *Continental Casualty Co. v. Polk Bros.*, 120 Ill.App.3d 395, 398, 457 N.E.2d 1271, 1274 (1st Dist.1983). Where the language of the lease is clear and unambiguous, there is no need for judicial interpretation. *Hoffman v. Clark St. Roadhouse*, 79 Ill.App.3d 41, 43, 398 N.E.2d 238, 239 (1st Dist.1979). However, it is well established that where there is any doubt or uncertainty as to the meaning of the language used in a lease it should be construed most strongly against the lessor and in favor of the lessee. *In re National Sugar Refining Co.*, 21 B.R. 196, 198 (Bankr.S.D.N.Y.1982); *J.B. Stein & Co. v. Sandberg*, 95 Ill.App.3d 19, 22, 419 N.E.2d 652, 655 (2d Dist.1981). In particular, where a lessor has drafted the lease, a court will not impose by judicial construction a responsibility upon the lessee unless the circumstances and the lease itself clearly indicate that the lessee intended to assume such a responsibility. *Windsor at Seven Oaks v. Kelly*, 113 Ill.App.3d 978, 980, 448 N.E.2d 251, 253 (3d Dist.1983).

Reading paragraph 37 in conjunction with paragraph 39, Bon Ton has covenanted to maintain the sewer line as it services or is contiguous to the premises, whereas Heerey has, within the plainly understood language of paragraph 39, covenanted to give ordinary and reasonable care to common arterial systems.

The court concludes that rodding the common sewer line which services the entire building is the type of ordinary and reasonable care for which the lessor has agreed to be responsible. If, however, Bon Ton did not in fact clean its grease trap, thereby necessitating the rodding which would not otherwise have been required, it breached its covenant to keep the premises in good condition. Therefore, an evidentiary hearing on this factual question will be required to determine whether Bon Ton must reimburse Heerey for this expense. Nevertheless, this is not an impediment to Bon Ton's assuming the lease since the court is satisfied the debtor will be able to effect a prompt cure of this default in conformity with section 365(b)(1)(A) and has provided adequate assurance thereof.

However, Bon Ton's liability, if any, does not arise under paragraph 42 of the lease, as Heerey contends. Paragraph 42 contains an indemnification clause which, if an ambiguity exists necessitating construction of the language to give effect to the intention of the parties, will be strictly construed. *Tatar v. Maxon Construction Co., Inc.*, 3 Ill.App.3d 352, 277 N.E.2d 715 (4th Dist.1972); *Baillon v. S.S. Kresge Co.*, 4 Ill.App.3d 82, 277 N.E.2d 719 (4th Dist. 1972). Moreover, the court cannot consider this clause in isolation to defeat the intent of the parties that is found to be expressed when viewing paragraph 42 as a whole. *Stein v. Yarnall-Todd Chevrolet, Inc.*, 41 Ill.2d 32, 39, 241 N.E.2d 439, 443 (1968). As the court in *Stein* noted:

> Particular expressions will not control where the whole tenor or purpose of the instrument forbids a literal interpretation of the specific words.

*Id.* The dominating expression of intent under paragraph 42 contemplates the debtor's maintenance of public liability and property damage insurance, workmen's compensation insurance, and dram shop insurance covering any liability which may arise out of debtor's contemplated use of the premises as a restaurant.

This language requiring Bon Ton to obtain liability insurance is more restrictive

than the agreement to indemnify the lessor for any costs or expenses from its use or occupancy of the premises. Therefore, the incongruous words relating to general indemnification will not supercede the dominant expression of intent to indemnify to the extent of the specified liability policies. *See Stein v. Yarnall-Todd,* 41 Ill.2d at 39, 241 N.E.2d at 443. It cannot be stated that the indemnity clause when considered in the context of paragraph 42 in its entirety, as it should, shows an intent that any expense occasioned by debtor's performance under the lease was to be included therein. The court will not construe paragraph 42 so as to enlarge or extend Bon Ton's responsibility thereunder.

### Responsibility for Increased Insurance Premiums

Heerey further maintains that Bon Ton is in default under paragraph 42 of the lease, set forth above, for failure to pay increased insurance premiums of approximately $26,000 for the premises. As previously stated, the lessor's insurance carrier inspected the premises in June and December of 1983 and outlined the existence of seven dangerous and hazardous conditions. Heerey states that while Bon Ton has cleaned the grease in the breaker box panel and partially fixed certain tripping hazards with respect to the kitchen floor, all of these conditions have not been eliminated. As a result thereof, the lessor's insurance policy was cancelled and replacement coverage was obtained by the lessor at a substantially higher premium payment. Heerey contends that under paragraph 42 of the lease, Bon Ton must reimburse Heerey, at the time of assumption, for the increased insurance costs resulting from Bon Ton's use and occupancy of the premises. According to Heerey, the language of paragraph 42 is unambiguous and the parties intended its scope to be sufficiently broad so as to encompass any situation where a lessee's use and occupancy results either in increased insurance costs or any additional costs and expenses. Heerey further urges that the last sentence of paragraph 42 discussing the sale of alcoholic beverages does not limit the broad protection provided under the initial section to indemnify the lessor for any costs arising out of the debtor's use and occupancy.

Bon Ton replies that the lessor may assess insurance premiums against the debtor under the lease only in limited circumstances. First of all, paragraph 4 [6] mentions insurance in the context of misuse of the premises. However, this covenant is inapplicable, according to Bon Ton, because no allegations have been made that the debtor misused the premises; moreover, the language is clear that the parties did not intend any pass through of insurance under paragraph 4. Secondly, paragraph 28 [7] provides for a pass through of insurance premiums only when there is an increase occasioned by a change in cooking procedures which do not comply with legal regulations. Finally, Bon Ton contends that there is a pass through of insurance premiums under paragraph 42 only where an increase is related to the lessee's sale of alcoholic beverages. Contrary to Heerey's interpretation, Bon Ton maintains that paragraph 42 is merely a general exculpatory clause to hold the lessor harmless

---

**6.** Paragraph 4 provides in relevant part:

4. ... Lessee will not allow the Premises to be used for any purpose that will increase the rate of insurance thereon nor for any purpose other than hereinbefore specified.... Lessee will not use or allow the use of the Premises for any purpose whatsoever that will injure the reputation of the Premises or of the building of which they are a part.

**7.** Paragraph 28 provides:

28. Lessee agrees and covenants to comply with all regulations of cooking and ventilating systems as present law requires and in the event that such standards and/or devices are inadequate in accordance with the existing laws, they shall be changed and modified at Lessee's expense. Further, in the event that Lessee shall change existing cooking operations, Lessee shall pay any increase in the premium for such insurance due to lessee's failure to comply with all appropriate regulations, and it shall be the obligation of Lessee to pay as so much additional rent the increase upon rendition of statement therefor from the Lessor.

through the maintenance of the specified insurance policies and should not be given an all-encompassing and general interpretation. According to Bon Ton, the intent thereunder was merely for the debtor to hold Heerey harmless from personal injury and property damage claims arising out of Bon Ton's use and occupancy of the demised premises. Moreover, Bon Ton argues that, taking paragraph 42 as a whole, the last sentence thereof with respect to the sale of alcoholic beverages demonstrates that the parties clearly contemplated the issue of pass through of insurance premiums and chose to limit them in this manner.

As noted above, the court must give effect to the parties' intention as expressed in the lease's language when read as a whole, *In re Maxwell*, 30 B.R. 982, 986 (Bankr.N.D.Ill.1983), and where any ambiguity exists, the lease should be construed most strongly against the lessor who drafted the lease. With respect to the issue of increased insurance premiums, the lessor is relying upon an interpretation of a single clause in paragraph 42 of the lease. However, the first sentence must be read in light of the entire paragraph 42 as must every paragraph be read in light of the entire lease agreement. *Dasenbrock v. Interstate Restaurant Corp.*, 7 Ill.App.3d 295, 299, 287 N.E.2d 151, 154 (5th Dist. 1972).

As further noted above, the language requiring Bon Ton to maintain public liability and property damage insurance, workmen's compensation insurance, and dram shop insurance for the purpose of indemnifying the lessor is more restrictive than the general all-inclusive indemnification language and therefore is controlling on the paragraph's intent. Paragraph 42 in its entirety discloses a covenant by Bon Ton to indemnify the lessor for any property dam-

age or personal injury arising out of its use and occupancy to the extent of the requisite insurance policies. Moreover, the explicit language of the last sentence, whereby Bon Ton agrees to reimburse the lessor for any additional premium the lessor's insurance carriers might demand by virtue of the lessee's operation if related to the sale of alcoholic beverages only, is controlling on the question of the paragraph's intent regarding increased insurance premiums. Clearly the issue of increased insurance premiums was contemplated by the parties both in paragraph 42 and in paragraph 28 and was limited by the parties to the lessee's sale of alcoholic beverages and to any change by the lessee in existing cooking operations.

Further support for the court's holding is found in paragraph 4 of the lease which states that Bon Ton covenants not to use the premises for any purpose which will increase the rate of insurance thereon.[8] Thus, paragraph 4 demonstrates again that the parties contemplated the situation where the lessor's insurance premiums on the premises may increase through debtor's use and occupancy yet chose to agree that such a situation would be in the nature of a condition subsequent, constituting a breach of the lease, but imposed no covenant upon the debtor to be performed, i.e., to reimburse the lessor for the increased premiums.

Had the parties to the lease intended to pass through all increases in the lessor's insurance premiums for any reason whatsoever, a scrivener's pen was not wanting. Such an interpretation appears to be outside the scope of paragraph 42, particularly when read in conjunction with paragraphs 4 and 28. Again, the court will not impose by judicial construction a duty on the lessee to indemnify the lessor against any costs, even those outside its control,[9] which the

---

8. The court would interpret "any purpose" under this provision of the lease to be equivalent to an unauthorized, unlawful or perilous use of the premises. It would be anomalous to hold that the contemplated use being made by the lessee and to which the parties had agreed the premises could be put would thereafter consti-

tute a breach of the same agreement. *See Mark Steel Corporation v. Eimco Corporation,* 548 P.2d 892 (S.Ct.Utah 1976).

9. The court observes that increases in insurance premiums due to the cancellation of insurance by the lessor's former insurance carrier while

lease does not clearly reflect that the debtor intended to assume.

### Payment of Attorneys' Fees In Conjunction with Curing Defaults

Heerey contends that because certain defaults under the lease existed at the time Bon Ton filed its application to assume the lease, Heerey incurred fees and expenses under paragraph 15 in enforcing the lease provisions through his opposition to the motion to assume.

Paragraph 15 of the lease provides:

Lessee shall pay upon demand all Lessor's costs, charges and expenses, including fees of attorneys, agents and others retained by Lessor, incurred in enforcing any of the obligations of Lessee under the lease or in any litigation, negotiation or transaction in which Lessor shall, without Lessor's fault, become involved through or on account of this lease.

This broad provision of the lease is enforceable under Illinois law, according to Heerey, and is part of the burden to be assumed by the debtor. Heerey maintains that Bon Ton cannot unilaterally modify the lease to eliminate an obligation to pay attorneys' fees. Heerey further urges that these attorneys' fees must be paid as part of the curing of defaults at the time of Bon Ton's assumption of the lease.

Bon Ton's position is that attorneys' fees under paragraph 15 are only recoverable if the lessor should be sued on account of the lease through no fault of his own or if a default in an obligation exists and the fees incurred are directly attributable to enforcement of that particular obligation. Bon Ton argues that the bulk, if not all, of the attorneys' fees have been incurred herein as a result of unnecessary and unwarranted actions by the lessor and not as a result of a breach of lease obligations, other than nonpayment of one month's

rent, to be enforced. Therefore, according to Bon Ton, the attorneys' fees in issue have been incurred through lessor's own "fault" under paragraph 15 by his attempts to enforce nonexistent obligations upon Bon Ton.

Moreover, Bon Ton contends that the lessor's actions were unnecessary because section 365(b)(1) of the Code requiring the debtor to cure defaults or provide adequate assurance of a cure protects the lessor and alleviates any need for the lessor to enforce the lease obligations. Bon Ton further argues that it would contravene public policy to require it to pay the lessor's attorneys' fees because a lessor could deliberately incur attorneys' fees and create a default against the debtor which would not be based upon a breach of a covenant of the lease. Finally, Bon Ton states that if the lessor is entitled to attorneys' fees, the court must determine whether Heerey's broad interpretation of paragraph 15 leaving Bon Ton vulnerable to unlimited liability for attorneys' fees would constitute a penalty, and whether such fees are reasonable.

The determination to be made by the court at this juncture is not whether lessor's attorneys performed services justifying the fees sought but whether Bon Ton should pay the bill, "rather than the client these attorneys have well served." *See Quaker Oats Company v. Burnett*, 289 F.Supp. 283, 288 (D.Ct.E.D.Tenn.1968).

Heerey relies on *In re Bullock*, 17 B.R. 438 (Bankr.9th Cir.1982) in which the court awarded attorneys' fees to the lessor under section 365(b)(1)(A) and (B) upon the trustee's assumption of the lease as part of curing the debtor's default, consisting of three months' post-petition rent, and as compensation for the lessor's actual pecuniary loss. The lease therein required the lessee to pay reasonable attorneys' fees if the lessor should employ an attorney by reason of the lessee's default. The court

---

the lessee was in conformity with the terms of the lessee would be such a situation outside the lessee's control. *See In re Bon Ton Restaurant and Pastry Shop, Inc.*, No. 85 B 1755, Memorandum and Order (Bankr.N.D.Ill. July 18, 1985).

*See also Hagopian v. Brandon*, 116 N.Y.S.2d 799 (1952) (tenant not liable for increased insurance premium where use of premises was permitted by the landlord and was in conformity with the terms of the lease).

stated that the purpose of an attorney's fee clause in a lease is to indemnify the lessor against legal expenses incurred by reason of the other party's default which is the same purpose of section 365(b)(1)(B), i.e., to indemnify the other party to the assumed lease against loss. *Id.* at 439. Nevertheless, the court went on to state such a clause does not give the lessor "a blank check upon the estate of the debtor for attorney's fees." *Id.*

It is clear that if there has been a default, an award of attorneys' fees under paragraph 15 of the lease is proper under Illinois law. *Schipper & Block v. Carson Pirie Scott & Co.,* 5 Ill.App.3d 209, 283 N.E.2d 81 (3d Dist.1972). Bon Ton states that its only default under the lease is a failure to pay one month's rent whereas Heerey claims six defaults to be in existence as of the time Bon Ton filed its motion to assume the lease. Even if the only default was the failure to pay one month's rent, it appears that the lessor's court appearances and motions were not entirely unnecessary or unwarranted as Bon Ton contends. Therefore, Heerey is entitled to attorneys' fees under paragraph 15 of the lease.

Notwithstanding, a lease provision for attorneys' fees such as paragraph 15 does not convey an absolute right to recover such fees and the court in *Bullock* did not so hold. *In re J.W. Mays, Inc.,* 30 B.R. 769, 771 n. 3 (Bankr.S.D.N.Y.1983). Rather, where a contract between a debtor and a third party provides for an award of attorneys' fees, the court is obligated to determine the reasonable value of such services. *In re Tech Hifi, Inc.,* 49 B.R. 876, 881 (Bankr.D.Mass.1985). The lessor herein can recover under paragraph 15 only such sums as he necessarily expended on account of Bon Ton's default or defaults. Moreover, a lessor must take reasonable measures under Illinois law to mitigate damages recoverable against a defaulting lessee. Ill.Rev.Stat.ch. 110, § 9–213.1 (S.H. A.1983). The court observes that the total amount of fees awarded in *Bullock* was approximately $2,000. Under the facts presented in the case *sub judice* and the

reasonable inferences therefrom, it was unnecessary for Heerey to expend or become liable for a portion of the professional services of its counsel in enforcing Bon Ton's obligations under the lease. Under section 365(b)(1)(B), Bon Ton is required to pay only reasonable attorneys' fees, as determined upon application, expended by the lessor's attorneys in connection with the specific defaults found under the lease. The court is satisfied that Bon Ton has the ability to promptly compensate the lessor under section 365(b)(1)(B) for reasonable attorneys' fees incurred. Therefore, Bon Ton's assumption of the lease is not impaired.

### Cure of Non-Monetary Defaults at Time of Assumption

Heerey emphatically contends that Bon Ton is in default under the subject lease for failing to make all repairs, improvements, and alterations necessary to ensure that the premises are in a safe, attractive, and healthy condition under paragraph 37, set forth above with respect to the sewer rodding costs, and paragraphs 32 and 6 which provide:

32. Lessee agrees that the basement under the store is part of the demised premises and further agrees to maintain this area in a clean and sightly condition.

6. Lessee shall keep the Premises and appurtenances thereto in a clean, sightly and healthy condition, and in good repair, all according to the statutes and ordinances in such cases made and provided, and the directions of public officers thereunto duly authorized, all at his own expense, and shall yield the same back to Lessor upon the termination of this lease, whether such termination shall occur by expiration of the term, or in any other manner whatsoever, in the same condition of cleanliness, repair and sightliness as at the date of the execution hereof, loss by fire and reasonable wear and tear excepted. Lessee shall make all necessary repairs and renewals upon Premises and replace broken globes, glass and fixtures with material of the

same size and quality as that broken and shall insure all glass in windows and doors of the Premises at his own expense. If, however, the Premises shall not thus be kept in good repair and in a clean, sightly and healthy condition by Lessee, as aforesaid, Lessor may enter the same himself or by his agents, servants or employes [sic], without such entering, causing or constituting a termination of the lease or an interference with the possession of the Premises by Lessee, and Lessor may replace the same in the same condition of repair, sightliness, healthiness and cleanliness as existed at the date of execution hereof, and Lessee agrees to pay Lessor, in addition to the rent hereby reserved, the expenses of Lessor in thus replacing the Premises in that condition. Lessee shall not cause or permit any waste, misuse or neglect of the water, or of the water, gas or electric fixtures.

The unsafe and hazardous conditions alleged by the lessor, set forth earlier in this memorandum, have to do with the adequacy of the existing extinguishing and ventilation systems as well as related conditions in the cooking area and the kitchen, all reported to be fire hazards. According to Heerey, the existence of these conditions is a default that must be cured at the time of assumption. Heerey argues that if Bon Ton is permitted to assume the lease without curing these defaults, the court will, in essence, be modifying Bon Ton's contractual relationship with the lessor. Moreover, Heerey states that in order to assume, Bon Ton must provide adequate assurance that it will continue to keep the premises in a clean, healthy and safe condition in the future.

Heerey further refers to paragraph 28, set forth in footnote 7 above, and paragraph 27 which reads:

27. Lessee herewith agrees and covenants that he will comply with any and all Federal, State and Municipal laws, statutes, ordinances and regulations of the respective, bodies as now in existence or enacted and/or created from time to time. Further the Lessee agrees to hold harmless and indemnify the Lessor from any and all breaches of this provision arising out of Lessee's business, including the costs of Lessor defending itself in any situation which may arise as a result thereof.

The lessor states that several violations of the Chicago Municipal Code with respect to the fire suppression system in the cooking hood and related ventilation systems existed on the premises at the time the lease was entered into and these violations continue to exist at the present time. Therefore, according to Heerey, it is Bon Ton's responsibility under paragraph 27 of the lease to modify these systems to comply with the requirements of applicable law before the lease is assumed or to provide adequate assurance that these alleged defaults will be cured.

On September 6, 1985, Heerey presented his motion for reimbursement of his costs incurred in correcting the existing ventilation system. Inspections by the lessor's consulting engineer were conducted on July 29, 1985 and August 22, 1985 and the report in connection therewith set forth three violations of the Chicago Municipal Code: (1) the existence of inadequate clearances between the exposed surfaces of heat-producing appliances and any combustible material; (2) the existence of inadequate hood and duct thickness; and (3) the absence of a fusible link-operated damper or other means of bypassing the exhaust fan. Because Heerey has engaged the construction work to be performed in correcting these code violations, Heerey contends that Bon Ton must reimburse him as a pre-condition to assumption.

Bon Ton maintains that the current condition of the premises and the cooking and ventilation systems comply with the terms of the lease and those regulations required by present law, whereas the lessor has been using standards based upon insurance company specifications for these conditions, and therefore, Bon Ton is not in default under the lease. With respect to the municipal code violations which Heerey

has undertaken to correct, Bon Ton replies that, upon inquiry, its president was informed on September 9, 1985 by a City of Chicago fire inspector that there were no pending complaints for violations of the Chicago Municipal Code. Bon Ton reiterates that its only default is its failure to pay one month's rent which it can promptly cure or provide adequate assurance thereof. If, however, a default is found to exist, Bon Ton states its assumption of the lease is not impaired since it is presently able to provide adequate assurance of both a prompt cure and of future performance under the lease.

As discussed above, if the lease is in default and such default is in respect to some lease provision other than one relating to insolvency or the commencement of a Chapter 11 case, section 365(b)(1) requires that before the lease may be assumed the default be cured or adequate assurance given of its cure, the lessor be compensated for any pecuniary loss resulting from such default, and the debtor in possession provide adequate assurance of future performance under the lease. *In re Sapolin Paints, Inc.*, 20 B.R. 497, 499–500 (Bankr.E.D.N.Y.1982). The language of section 365(b)(1) does not distinguish between monetary and non-monetary defaults. Therefore, the court must initially determine whether defaults exist under the lease with respect to keeping the premises in good repair and relating to compliance with all legal regulations.[10]

This court has previously had occasion to construe paragraph 37 of the lease in the context of this case, noting that Bon Ton is required thereunder to maintain the premises in an attractive appearance and good condition, making such repairs, improvements and alterations of a non-structural nature in connection therewith. *In re Bon Ton Restaurant and Pastry Shop, Inc.*, No. 85 B 1755, Memorandum and Order (Bankr.N.D.Ill. July 18, 1985). Similarly, paragraph 6 of the lease contains a general

covenant to repair which, under Illinois law, merely binds the tenant to make ordinary repairs reasonably required to keep the premises in proper condition, thereby preserving the status quo. *Baxter v. Illinois Police Federation*, 63 Ill.App.3d 819, 821, 380 N.E.2d 832, 834 (1st Dist.1978). Such a clause does not require a lessee to make radical changes of a permanent, substantial or unusual character. *Bogan v. Postlewait*, 130 Ill.App.2d 729, 731, 265 N.E.2d 195, 197 (4th Dist.1970). The classification of repairs as structural or substantial depends in particular on the foreseeability of the deficiency, since it has been thought unfair to hold a lessee liable for substantial permanent improvements not within the contemplation of the parties when the lease was executed. *Koenigshofer v. Shumate*, 68 Ill.App.2d 474, 477, 216 N.E.2d 195, 196 (1st Dist.1966); *Kaufman v. Shoe Corp. of America*, 24 Ill.App.2d 431, 436, 164 N.E.2d 617, 621 (3d Dist. 1960). In order to shift onto the lessee a burden which would naturally fall on the lessor, the warrant for the change must be plainly discoverable in the lease. *Hardy v. Montgomery Ward & Co.*, 131 Ill.App.2d 1038, 1041–42, 267 N.E.2d 748, 751 (5th Dist.1971).

The court concludes that under paragraphs 6 and 37 of the lease Bon Ton must promptly cure those fire hazards which in fact exist on the premises and which do not require replacement of existing equipment or changes of a structural nature. Specifically, Bon Ton must dispose of any accumulation of grease in the breaker box panel and behind the stoves, install fire extinguishers in the kitchen area, encase electric lights in the kitchen, ensure the kitchen floor is in a state of repair, ensure the air conditioner is in safe operating condition, dispose of any combustible material near the cooking area or behind the freezers, clear emergency exits of clutter and ensure the exit signs over the main exit are light-

---

10. Bon Ton has alleged that Heerey's reliance on paragraph 32 of the lease is misplaced since Bon Ton does not have present possession of the entire basement. Heerey has made no reply to this statement. Notwithstanding, paragraph 32 is not dispositive or germane to the issues herein and is therefore not discussed.

ed, and correct any running of water from the kitchen to the basement. The pleadings reflect that some, if not all, of these conditions have been remedied. Moreover, the record is replete with promises by the debtor to perform according to the terms of the lease so that the court finds Bon Ton has provided adequate assurance of a prompt cure of these conditions.

With respect to compliance with all legal regulations, the lessor seizes upon the language in paragraphs 6, 27, and 28 to hold Bon Ton liable for the costs of replacing the cooking and ventilation systems recently alleged to be in violation of the Chicago Municipal Code. The record reflects that the conditions of which the lessor now complains existed at the time the lease was signed. Moreover, with the exception of the alleged non-compliance of the ventilation and related systems with the Chicago Municipal Code, the premises were, at the commencement of the lease term, in an adequate state of repair to meet all reasonable needs and requirements of the debtor/lessee.

The court interprets these paragraphs of the lease to require that if city authorities had forbidden debtor's use of the premises until these corrections of the cooking and ventilation systems were made, the debtor would have had the responsibility of making such changes if it desired to continue using the premises. However, the debtor has not been ordered to cease operations until such changes were made, nor has the lessor been subjected to any penalty because of the debtor's alleged violation of these laws. The debtor has been able to make such use of the premises as it desired without strict compliance with such laws and ordinances. The expense incurred has not been occasioned by Bon Ton's violations of the laws and ordinances, and would have been required even if the property had stood unleased during the term of this lease. See Puget Inv. Co. v. Wenck, 221 P.2d 459 (S.Ct.Wash.1950). Rather than construing the covenant in paragraphs 27 and 28 as an affirmative obligation to repair, alter or improve, this court concludes that its intent is only to place upon the

lessee rather than the lessor the responsibility for making any repairs, alterations or improvements which the lessee finds necessary to enjoy the use of the premises, to indemnify the lessor for expenses directly resulting from unlawful use, and to provide the lessor with a basis to require the lessee to cease any unlawful activity which may occasion expense for the lessor or damage to the reversion apart from the use or condition of the premises at the time the lease was executed. Id. at 466.

Further, the court notes that under paragraph 6, Bon Ton covenanted to keep the premises in good repair according to applicable statutes and ordinances and to yield back the premises in the same condition of repair and sightliness as of the date of execution. A reasonable interpretation is that Bon Ton has not covenanted to install updated equipment to replace what was obsolete when it took possession but to keep the premises and equipment in as good repair as when the lease was executed. The debtor should not be required to absorb the cost of creating something new. Kaufman v. Shoe Corp. of America, 24 Ill.App.2d 431 at 437, 164 N.E.2d 617 at 621.

■ The court further finds with respect to the issue of compliance with all legal regulations that Heerey is equitably estopped from claiming any breaches in connection therewith to be defaults to be cured at the time of assumption. Paragraph 41 of the lease provides in relevant part:

41. Anything to the contrary notwithstanding, except as herein provided, it is understood and agreed that in the event that the Lessee shall breach, violate and/or default in any of the terms of the Lease except for the payment of monies as herein provided, and matter relating to insurance, that within fifteen (15) days of the sending of notice as herein provided, the Lessee shall correct and/or rectify any such defaults.

\*      \*      \*      \*      \*      \*

Although the record reflects that the alleged breaches of which the lessor now complains existed at the time the lease was executed, the failure of the lessor to give the Bon Ton the requisite notice that its cooking and ventilation systems did not comply with the Chicago Municipal Code during the course of the lease and prior to Bon Ton's decision to assume prevents any breach from becoming a default to be cured at the time of assumption. *In re Sapolin Paints, Inc.*, 5 B.R. 412, 419 (Bankr.E.D.N.Y.1980); *In re Lafayette Radio Electronics Corp.*, 7 B.R. 189, 193 (Bankr.E.D.N.Y.1980).

The debtor had no knowledge, or means of knowledge, of these particular violations at the time of entering into the lease or during the term thereof since neither party has ever been cited for these violations. It was only subsequent to the present assumption proceeding that the lessor had an expert come onto the premises for the purpose of finding these code violations. Bon Ton detrimentally relied on the lessor's silence since it may not have decided to assume the lease as in the best interests of the estate if such assumption would entail expending substantial sums. If the lessor intended to claim these particular defaults under the lease, it was incumbent on him to serve timely notice on Bon Ton. The court concludes that Heerey has the responsibility under the lease and under the doctrine of equitable estopel to bear the costs incurred in replacing the present cooking and ventilation system in order to comply with the Chicago Municipal Code.

Finally, the court must construe the requirements of section 365(b)(1)(C) under the facts and circumstances of this case. Heerey has urged total inability on Bon Ton's part to assume the lease by satisfying section 365(b)(1). In particular, Heerey has opposed assumption on the grounds that he has not been adequately assured of future performance under the lease pursuant to section 365(b)(1)(C). With respect to the concept of adequate assurance of future performance, the court in *Matter of Luce Industries, Inc.*, 8 B.R. 100 (Bankr.S.D.N.Y.1980) observed:

Section 365(B)(1) attempts to strike a balance between two sometimes competing interests, the right of the contracting nondebtor to get the performance it bargained for and the right of the debtor's creditors to get the benefit of the debtor's bargain ... Nowhere is the tension between these interests, and the difficulty in striking the balance, more apparent than in trying to determine whether there is the requisite adequate assurance of future performance.

*Id.* at 107 (citations omitted).

The phrase "adequate assurance of future performance," adopted from section 2–609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case. *Matter of U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr.S.D.N.Y.1982). Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance. *Matter of Luce Industries, Inc.*, 8 B.R. at 107. As further stated by the court in *Luce:*

> It is a basic presumption in our system of law that parties to a contract will proceed in good faith in fulfilling their contractual obligations.... Every single detail need not be hammered out and amplified as it seems [the lessor] desires.... Further if necessary, [the lessor] is free to return to this court and seek additional relief, which if instituted by an order to show cause, would receive attention on an expedited basis.

*Id.* at 108.

What the Code requires is that the lessor be given the performance for which he has contracted. *In re Sapolin Paints, Inc.*, 5 B.R. at 420. It is .not intended that a non-debtor party should acquire greater rights in a case under the Code than he has outside the Code. Report of the Commission on Bankruptcy Laws of the United States, H.R.Doc. No. 93–137, 93d Cong., 1st Sess. Pt. II 156–57 (1973); *Matter of National Shoes, Inc.*, 20 B.R. 55, 59 (Bankr.S.D.N.Y.1982). A Lessor cannot insist that

bankruptcy law gives him what the lease itself does not, i.e., assurance that the lessee will not bring about any condition which entitles the lessor to prematurely terminate the lease. *In re Sapolin Paints, Inc.*, 5 B.R. at 420. Therefore, the court will not give the lessor herein a guaranty of future performance nor greater rights than it had pre-petition. Heerey demands that which its lease with Bon Ton does not provide. As long as Heerey has a right to terminate the lease upon default, a right which will in no way be diminished by assumption, he would seem to have all that he has bargained for, which is all the Code intended to provide. *Id.* Moreover, swift relief from the court should the debtor fail to perform is the best assurance of all. *In re Hub of Military Circle, Inc.*, 13 B.R. 288 (Bankr.E.D.Va.1981).

Considering all the facts of the proposed assumption, there is present here adequate assurance of future performance of the terms of the lease. Bon Ton has shown both willingness and ability to undertake performance of the lease and to thereby succeed in providing Heerey with the benefit of his bargain. Based on the apparent viability of debtor's business, the debtor's prospects for reorganization, and the length of the lease term remaining, *see In re Hub of Military Circle, Inc.*, 13 B.R. 288 at 461, it appears reasonably certain that the lessor will receive complete performance under the terms of the lease since the debtor appears capable of continued full performance.

The court is cognizant of the fact that a debtor in possession assumes a contract or unexpired lease subject to its terms and conditions; it cannot accept in part and reject in part. *In re TSW Stores of Nanuet, Inc.*, 34 B.R. 299, 304 (Bankr.S.D.N.Y. 1983). If a debtor wishes to have the benefits of its unexpired lease, it must also accept the burdens. *In re Berkshire Chemical Haulers, Inc.*, 20 B.R. 454, 456–57 (Bankr.D.Mass.1982). Although the bankruptcy court has the equitable power to modify lease provisions if doing so would benefit the estate and not significantly prejudice the lessor, a debtor cannot

utilize section 365 to relieve itself of conditions which are clearly fixed by the contracting parties as an essential part of their bargain and which do not contravene overriding federal policy. *Matter of Easthampton Sand & Gravel Co., Inc.*, 25 B.R. 193 (Bankr.E.D.N.Y.1982).

However, the facts of this case lead the court to conclude that the lessor herein, by invoking the provisions of the Bankruptcy Code, seeks to terminate a valuable property interest upon any default, however minor, without affording the lessee an opportunity to cure. *See In re Belize Airways, Ltd.*, 5 B.R. 152, 154 (Bankr.S.D.Fla.1980). *See also Matter of Goldblatt Bros, Inc.*, 766 F.2d 1136 (7th Cir.1985) (debtor's nonuse of second floor of premises under partial percentage rent lease did not necessarily constitute a material breach and therefore was not a default requiring cure and compensation under section 365(b)(1) since debtor was in substantial compliance with the terms of the lease). As the court in *Matter of National Shoes, Inc.*, 20 B.R. 51 (Bankr.S.D.N.Y.1982) observed with respect to section 365(b)(1):

> While it is true that the debtor does have the obligation to cure prepetition defaults by prompt payment or by giving assurances of prompt payment, and to provide adequate assurance for future performance as to its lease, Section 365 goes only that far. The debtor's enterprise at the site will not be disrupted and its Chapter 11 impaired because the landlord would like another tenant, or more from the debtor than the lease provides.

*Id.* at 53.

■ The court is satisfied that Bon Ton has met the conditions of section 365(b)(1). Bon Ton is willing and able to promptly effect a cure of any existing defaults, and has provided the requisite adequate assurances in connection therewith. Further, other than attorneys' fees incurred, the debtor's defaults do not of and by themselves establish actual pecuniary loss requiring section 365(b)(1)(B) compensation. The court concludes that the only defaults

that Bon Ton must cure as a condition to assumption, in addition to any rent payments due, are the costs of rodding the sewer line, if established to be Bon Ton's responsibility after an evidentiary hearing, the reimbursement of reasonable attorneys' fees, and the correction of the necessary fire hazards enumerated by the court. The court further concludes upon examination of the lease that Bon Ton must also cure the remaining defaults alleged by Heerey if they have not already been cured,[11] i.e., failure to pay water rents since April, 1983, failure to pay remaining $1,000 installment of debtor's security deposit, and failure to obtain plate glass insurance.[12] The court believes that the costs Bon Ton will have to bear in curing defaults are relatively minor, and therefore its assurances of prompt cure are adequate. Upon cure, the parties would return to their pre-petition stance with no further lessor remedies for conduct prior to the date of assumption. *Allied Technology, Inc. v. R.B. Brunemann & Sons*, 25 B.R. 484, 500 (Bankr.S.D.Ohio 1982).

In ruling on the question of assumption of an unexpired lease, the court must be reasonably satisfied that if the debtor is not going to cure a default immediately, it ill be able to do so within a period of time deemed to be prompt which varies according to the circumstances of a particular case. *In re Berkshire Chemical Haulers, Inc.*, 20 B.R. 454, 459 (Bankr.D.Mass.1982). *See In re Lawrence*, 11 B.R. 44 (Bankr.N.D.Ga.1981) (ten months); *In re Belize Airways Limited*, 6 B.R. 157 (Bankr.S.D.Fla.1980) (fifteen days); *In re A.R. Dameron & Associates, Inc.*, 3 B.R. 450 (Bankr.N.D.Ga.1980) (at the time of or before assumption). The court holds that debtor's cure of these defaults within ninety days would constitute a prompt cure.

The court concludes that Bon Ton's assumption of the unexpired lease is in the best interests of creditors and the estate.

The court is mindful of the fact that court approval of assumption on behalf of a debtor/lessee must give due regard to the interests of the lessor. However, the court finds that the lessor herein is not prejudiced by assumption since it is being made whole by the curing of the defaults found by the court and by the adequate assurances given pursuant to section 365(b)(1).

IT IS HEREBY ORDERED that Bon Ton may assume the unexpired lease. IT IS FURTHER ORDERED that Bon Ton has ninety days from the date of this order to cure all defaults hereunder as well as a similar ninety day period after final determination of the question of sewer rodding costs and reasonable attorneys' fees.

IT IS FURTHER ORDERED that Heerey shall have sixty days within which to present its application for attorneys' fees for court approval. An evidentiary hearing with respect to the sewer rodding costs will be held on November 19, 1985 at 10:30 a.m.

---

11. Heerey has indicated that certain of the defaults which existed at the time of Bon Ton's application to assume have been cured.

12. The court determined in its order of July 18, 1985 that Bon Ton does carry and maintain public liability and property damage insurance as paragraph 42 of the lease requires.